# WHOLE COURT

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**November 22, 2013**

# In the Court of Appeals of Georgia

A13A1046. DJ MORTGAGE, LLC et al. v. SYNOVUS BANK d/b/a BANK OF NORTH GEORGIA.

McFADDEN, Judge.

DJ Mortgage, LLC obtained a line of credit from Synovus Bank d/b/a Bank of North Georgia to fund its business of making short-term "hard money" loans to real estate investors. This action arises out of the breakdown in that relationship. Central to the issues before us are four claims by DJ of breach of contract by the bank. The trial court granted summary judgment in favor of the bank as to all four claims, and we reverse as to three. First, DJ claims that the bank was not to record the security interests assigned to it except in the event of a default by DJ. As to this claim the contract documents are inconsistent, the ambiguity created by that inconsistency cannot be resolved as a matter of law, and the claim must go to a jury. Second, DJ

claims that the bank breached a duty to "endeavor" to timely review loan requests. We reject the bank's contention that this obligation is meaningless and find that the question of breach must to go a jury. Third, DJ claims that the bank breached a duty to cooperate with DJ in foreclosing on properties securing its underlying loans. Again we reject the bank's contention that it had no such duty and find that the question of breach must go to a jury. Finally, DJ contends that the bank breached the contract when it stopped advancing DJ money. But as to this fourth claim, we agree with the trial court. The bank was entitled to cut off funding in certain circumstances and undisputed evidence establishes at least one such circumstance.

John Smithgall, one of DJ's principals, personally guaranteed the bank's loan to DJ. The bank subsequently stopped allowing DJ to draw on the line of credit, citing DJ's violation of certain covenants in its loan agreement with the bank. DJ and Smithgall brought an action alleging the four breach of contract claims against the bank summarized above. They sought declarations concerning their obligation to perform under the loan agreement, the enforceability of Smithgall's personal guaranty, and how the collateral securing the loan should be credited to the amounts, if any, that they owed the bank under the loan agreement. They also sought attorney fees and costs of litigation. The bank counterclaimed, inter alia, that DJ and Smithgall

2

breached the loan agreement and that Smithgall breached the guaranty, and sought attorney fees and costs of litigation. The trial court granted summary judgment to the bank on all claims, and DJ and Smithgall appeal.

As detailed below, genuine issues of material fact preclude summary judgment on DJ's and Smithgall's claim that the bank breached the loan agreement by recording assignments, failing to review requests for advances, and refusing to cooperate in foreclosure efforts. Accordingly, we reverse the grant of summary judgment on those claims. But no genuine issues of material fact exist as to their claim that the bank breached the loan agreement by ceasing to fund DJ, and we affirm the grant of summary judgment to the bank on that claim.

The existence of genuine issues of material fact as to whether the bank breached the loan agreement drives our resolution of the remaining claims of error. We reverse the grant of summary judgment to the bank on the claims and counterclaims related to whether the bank could enforce the loan agreement or Smithgall's guaranty of the loan, because genuine issues of material fact exist as to whether the bank breached the loan agreement and, if so, whether it acted with gross negligence or wilfulness. We also reverse the grant of summary judgment to the bank on the claims for declaratory relief regarding how collateral should be credited to the

3

amount, if any, owed to the bank under the loan agreement; the trial court based its ruling on this issue on its erroneous determination that the bank was entitled to summary judgment on all of the claims of breach of contract.

Finally, given our determination that the bank was not entitled to summary judgment on all of the breach of contract claims, we vacate the trial court's award of attorney fees and costs of litigation to the bank and reverse the grant of summary judgment to the bank on the claim for attorney fees and costs brought by DJ and Smithgall. We remand the case for further proceedings not inconsistent with this opinion.

1. *Facts and procedural history.*

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." OCGA § 9-11-56 (c). "We review the grant or denial of a motion for summary judgment de novo, and we must view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmovant." *Woodcraft by MacDonald v. Ga. Cas. & Surety Co.*, 293 Ga. 9, 10 (743 SE2d 373) (2013) (citation and punctuation omitted).

4

So viewed, the evidence showed that DJ was in the business of extending short-term "hard money" loans (the "underlying loans") to real estate investors. DJ's manager described its business as "providing capital to real estate investors, to purchase and renovate properties and sell them or refinance." Hard money loans typically are closed within two weeks of the borrowers' request for a loan.

To finance its operations, in 2007 DJ obtained a line of credit from the bank (the "loan"). It would request the bank to approve advances on the line of credit to make specific underlying loans. The notes and deeds to secure debt associated with the underlying loans secured the bank's loan to DJ, and the parties memorialized these arrangements in agreements that included a loan agreement and a collateral assignment agreement. The collateral assignment agreement provided that certain "transfer documents," which included the deeds to secure debt on the underlying loans, would be assigned to the bank, which would in turn hold the assignments in escrow and record them only if DJ defaulted on the loan.

Two years later, in 2009, DJ and the bank entered into negotiations to renew the loan. Smithgall's son, who worked at DJ as Smithgall's "eyes and ears," participated in the negotiations, during which the bank informed him that it was going to require the assignments of the deeds to secure debt on the underlying loans to be

5

recorded. Smithgall's son objected, stressing to the bank that such action would impede DJ's ability to foreclose on the properties securing the underlying loans.

At a closing on October 27, 2009, the parties entered into a new loan agreement and a new collateral assignment agreement, and Smithgall executed a guaranty of the loan. Shortly thereafter, despite DJ's objections, the bank began requiring that at least some of the security deed assignments be recorded, and DJ's closing attorney began recording some of the assignments, following closing instructions provided by DJ at the bank's direction. The recording of the assignments impeded DJ's ability to pursue foreclosure remedies against borrowers who defaulted on the underlying loans by transferring to the bank DJ's interest in the properties securing the underlying loans.

DJ sought help from the bank to resolve this foreclosure problem, requesting that, when underlying loans went into default, the bank either reassign to DJ the security deeds on those underlying loans or foreclose on the properties itself. Although the bank repeatedly promised to "fix" the foreclosure problem, it did not cooperate with DJ's requests or efforts to do so but instead gave DJ what Smithgall described as the "runaround."

The bank also did not timely act on some of DJ's requests for advances from its line of credit, which affected DJ's ability to act quickly on its borrowers' hard money loan requests. DJ's financial situation deteriorated.

On May 17, 2011, counsel for the bank sent a letter notifying DJ that it was in default of the 2009 loan agreement on account of, among other things, several loan covenant breaches. Therein, the bank stated that, until the default was cured, it would no longer provide advances to DJ under the 2009 loan agreement. The bank's counsel sent another letter on October 6, 2011, noting that the default had not been cured and demanding repayment of the loan.

2. *Claims for breach of contract against the bank.*

DJ and Smithgall alleged in their complaint that the bank breached the 2009 loan agreement in four ways: (1) by recording the assignments of the security deeds on the underlying loans, (2) by failing to timely review DJ's requests for advances from the line of credit, (3) by withholding cooperation from DJ in its foreclosure efforts, and (4) by ultimately ceasing to fund DJ. The trial court, in granting summary judgment to the bank, construed the 2009 loan agreement to require that the assignments be recorded; to impose no requirement upon the bank either to advance funds or to respond to DJ's funding requests in any specific time period; and to

authorize the bank to cease funding DJ entirely due to DJ's violations of certain loan covenants. As detailed below, we find that the trial court erred in construing the 2009 loan agreement, that genuine issues of material fact exist as to whether the bank breached the agreement in three of the four ways alleged by DJ and Smithgall, and that genuine issues of material fact also exist as to whether the alleged breaches damaged DJ and Smithgall.

a. *Construction of the 2009 loan agreement.*

DJ and Smithgall argue that the trial court misapplied the rules of contract construction.

> [T]he construction of contracts involves three steps. At least initially, construction is a matter of law for the court. First, the trial court must decide whether the language is clear and unambiguous. If it is, the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning. Next, if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity. Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury. Because the first two of these steps involve questions of law, the trial court's application of them is reviewed de novo.

8

*City of Baldwin v. Woodard & Curran, Inc.*, 293 Ga. 19, 30 (3) (743 SE2d 381) (2013) (citations omitted).

Applying this standard, as detailed below, we find that the trial court erred in its construction of the 2009 loan agreement and that genuine issues of material fact preclude summary judgment on three of the four breach of contract claims asserted by DJ and Smithgall.

i) *The first claim of breach: Recording assignments.*

DJ and Smithgall argue that the trial court erred in granting summary judgment to the bank on their claim that the recording of assignments breached the 2009 loan agreement. The recording of the assignments, they claim, harmed DJ because it transferred to the bank title in the properties securing the underlying loans, preventing DJ from foreclosing on those properties when the underlying loans went into default. They contend that the 2009 loan agreement required the bank to hold the assignments in escrow and allowed the bank to record them only in certain instances. The bank argues that, to the contrary, the 2009 loan agreement required the assignments to be recorded. The bank alternatively argues that, even if the 2009 loan agreement required it to hold the assignments in escrow, DJ and Smithgall waived this requirement by participating in the subsequent recording of assignments.

9

(a) *Requirement to hold assignments in escrow or record them.*

The 2009 loan agreement contains two conflicting provisions as to the recording of assignments of the deeds to secure debt on the underlying loans – one requiring the assignments to be held in escrow and recorded only upon the occurrence of certain "events of default," and the other requiring the assignments to be recorded if they pertain to "notes receivable" (a category that appears to include the notes on the underlying loans). This conflict creates an ambiguity in the agreement that cannot be resolved through the application of the rules of contract construction. And the relevant parol evidence also conflicts.

(i) *The conflicting provisions.*

One of the conflicting provisions – upon which DJ and Smithgall rely – is embedded within the 2009 loan agreement's definition of "transfer documents." The 2009 loan agreement expressly adopts the definition of "transfer documents" from the collateral assignment agreement, providing that "'Transfer Documents' shall have the meaning assigned to such term in the Collateral Assignment." That meaning is not set out in the 2009 collateral assignment agreement itself. Instead, the 2009 collateral assignment agreement incorporates by reference the parties' 2007 collateral assignment agreement. The 2007 collateral assignment agreement's definition of

10

"transfer documents" takes the form of a lengthy sentence followed by a parenthetical containing the phrase "transfer documents." That lengthy sentence includes the requirement to which DJ and Smithgall cite – that the bank must hold the assignments in escrow and record them only under certain circumstances. It states:

> [DJ] shall upon delivery to [the bank] of each original Underlying Note[1] and copies of other Underlying Loan Documents (including, without limitation, the recorded Underlying Security Instruments[2]) deliver to [the bank] an allonge with respect to each Underlying Note and transfer and assignment documents with respect to the other Underlying Loan Documents acceptable to [the bank] (and which transfer and assignment documents will be with warranty from [DJ] and with recourse as to [DJ] and shall be enforceable and recordable under applicable law; *provided, however, [the bank] shall hold same in escrow pending the occurrence of an Event of Default hereunder at which time [the bank] may record same of record*) (the "Transfer Documents")[.]

(Emphasis supplied.)

---

[1] The 2009 loan agreement defines "Underlying Note" as "the promissory note from a Note Obligor to [DJ] in connection with a Hard Money Loan."

[2] The 2009 loan agreement defines "Underlying Security Instrument" as "the security deed, mortgage or deed of trust securing the payment of an Underlying Note and which has been properly recorded in the official records where the Secured Property is located and creates a first priority security interest therein."

The conflicting provision – upon which the bank relies – is embedded within the 2009 loan agreement's definition of "notes receivable." The 2009 loan agreement defines "notes receivable" as "all promissory notes now or at any time hereafter made in favor of [DJ], promissory notes receivable now or hereafter owing to [DJ], instruments held by [DJ], and related supporting obligations of [DJ] in which Bank holds a first perfected security interest which meets each of the following requirements[.]" It then lists the requirements for creating the perfected security interest giving rise to a note receivable, and includes in that list the requirement to which the bank cites – that assignments shall be recorded. The sentence containing that requirement states:

> Bank must have in its possession the originally fully executed Underlying Note, and an original Allonge attached to said Underlying Note assigning same to Bank, a copy of the fully executed Underlying Security Instrument sent for recording . . . , once returned from recording, the original Underlying Security Instrument, a copy of the loan title insurance commitment issued in connection with the Underlying Security Instrument . . . , evidence of property insurance on the property covered by the Underlying Security Instrument acceptable to Bank, *and a fully executed copy of the assignment and transfer document from [DJ] to Bank with respect to the Underlying Note and Underlying Security Instrument in a form acceptable to Bank, the original of which shall be recorded in the applicable jurisdiction, and*

*the original recorded assignment shall be provided to Bank when received back from recording*[.]

(Emphasis supplied.) Although DJ and Smithgall argue that this provision does not create a conflict because the definition of "notes receivable" is irrelevant to the treatment of assignments on the underlying loans, we are not persuaded; another provision of the 2009 loan agreement requires DJ to compile reports for the bank that appear to treat the indebtedness of DJ's customers on the underlying loans as "notes receivable" to DJ.

Because the two above-quoted provisions conflict, the 2009 loan agreement is susceptible to more than one reasonable interpretation regarding whether and when the assignments may be recorded. Consequently, the 2009 loan agreement is ambiguous. See *McGuire Holdings v. TSQ Partners*, 290 Ga. App. 595, 602 (2) (b) (660 SE2d 397) (2008).

(ii) *Application of the rules of contract construction.*

We therefore proceed to apply the rules of contract construction, which point in conflicting directions. In determining that the 2009 loan agreement required that the assignments be recorded, notwithstanding this conflict, the trial court cited the rule in Williston on Contracts § 73.17, which provides that "[a] contract containing

13

a term inconsistent with a term of an earlier contract between the same parties is interpreted as including an agreement to rescind the inconsistent term in the earlier contract." This rule is inapposite, because the requirement that the assignments be held in escrow is not merely a term of an earlier contract; it also is a term of the 2009 loan agreement, having been expressly adopted by the parties as part of the sentence that serves as the definition of "transfer documents."

Moreover, the construction argued by the bank and reached by the trial court contravenes the rule that "[t]he construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part." OCGA § 13-2-2 (4). Under this rule, "a contract should be construed by examining the agreement in its entirety, and not merely by examining isolated clauses and provisions thereof." *Alimenta (USA) v. Oil Seed South*, 276 Ga. App. 62, 63 (622 SE2d 363) (2005) (citation and punctuation omitted). And "whenever possible, a contract should not be construed in a manner that renders any portion of it meaningless." *Schwartz v. Schwartz*, 275 Ga. 107, 109 (2) (561 SE2d 96) (2002) (citations omitted). The construction urged by the bank, however, would require us to do just that – to follow one of the 2009 loan

14

agreement's requirements as to the recording of assignments while disregarding the other.

Construing the 2009 loan agreement as a whole reveals other provisions that, consistent with the position taken by DJ and Smithgall, contemplate that assignments would be held in escrow and not recorded as a matter of course. One such provision states that, "[u]pon the occurrence and during the continuance of an Event of Default" the bank may "record[ ] all or any of the Transfer Documents in the applicable jurisdiction to cause the transfer of record to Bank of [DJ's] security interest under the outstanding Underlying Security Instruments." Another such provision describes the delivery of assignments to the bank "in a form acceptable to Bank and in recordable form under the laws of the applicable jurisdiction in which any such assignment *may need to be recorded* to perfect Bank's interest in the Underlying Security Instrument." (Emphasis supplied.) The most natural reading of this conditional language supports the construction advocated by DJ and Smithgall. While it is possible, as the dissent demonstrates, to construct a plausible argument for the proposition that this conditional language can be reconciled with the mandatory language on which the bank relies, the need for such an argument is an indication that the agreement is ambiguous.

Continuing to construe the 2009 loan agreement as a whole, we must consider a provision entitled "Incorporation by Reference," which provides:

> Each of the Loan Documents, whether delivered to and accepted by Bank contemporaneously herewith or from time to time hereafter, shall be and hereby are incorporated herein and made[ ] a part hereof by this reference. *In the event of any conflict or inconsistencies among any of the various terms and provisions which appear in this Agreement and other Loan Documents, the provisions most favorable to Bank shall control.*

(Emphasis supplied.) The bank pointed to this provision in support of its motion for summary judgment below, but it has not argued that point on appeal. Because this provision is in a paragraph addressing the incorporation of other loan documents by reference, we construe this provision to concern conflicts between the 2009 loan agreement and the other documents incorporated therein by reference, rather than conflicts between specific provisions of the 2009 loan agreement itself. See *Estate of Pitts v. City of Atlanta*, __ Ga. App. __, __ (4) (b) (ii) (746 SE2d 698) (2013) (cert. pending) (considering headings in contract as indicators of meaning); *Holmes v. Clear Channel Outdoor*, 284 Ga. App. 474, 477-478 (2) (644 SE2d 311) (2007) (considering provision within context of its specific placement in contract, including surrounding language and section title, to determine meaning). Consequently, this

16

provision does not resolve the conflict between the requirements regarding recording of the assignments.

Turning to other rules of contract construction, we find support for both the interpretation urged by DJ and Smithgall and that urged by the bank. One such rule provides that "in the event of . . . a conflict, the first provision prevails." *Wilner's, Inc. v. Fine*, 153 Ga. App. 591, 594 (3) (266 SE2d 278) (1980). But see Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (West 2012), at 189 (criticizing rule that construes conflicting provisions of contract based on primacy of placement therein). This rule favors the bank, because the requirement that assignments be recorded precedes the requirement that the assignments be held in escrow. But in DJ's favor, another rule of contract construction provides that ambiguities generally are to be construed against the drafter of the contract, which in this case was the bank. *Reichman v. Southern Ear, Nose & Throat Surgeons*, 266 Ga. App. 696, 699-700 (1) (598 SE2d 12) (2004).

The structure of the 2009 loan agreement suggests, contrary to the bank's argument, that the provisions regarding the recording of assignments are *not* central to the agreement's purpose. Both the term pointed to by DJ and that pointed to by the

17

bank are buried within the agreement's definitional section, rather than in sections addressing the parties' rights and obligations.

Structural analysis underlies the rule on which the dissent relies. The dissent relies on the rule set forth in 13 Corbin on Contracts § 71.1 (5), which provides that when parties enter into a substitute contract, the "new contract may adopt and include a part of the antecedent one. Consequently, the two contracts must be construed together. Insofar as they are inconsistent, the later one prevails[.]" We have found no Georgia case applying this rule to the circumstances presented in this case – where the parties expressly incorporate into their contract a specific, but conflicting, term from an earlier contract. While the rule set forth in Corbin does favor the bank, we do not view it to be dispositive of the parties' intent regarding the recording of assignments, given the placement of the terms regarding recording of assignments within the structure of the document and given that other rules of construction favor DJ. "'[N]o canon of interpretation is absolute. Each may be overcome by the strength of differing principles that point in other directions.'" *Estate of Pitts*, __ Ga. App. at __ (4) (quoting Scalia and Garner at 59).

(iii) *Parol evidence.*

18

We turn, therefore, to parol evidence, which also conflicts. The "cardinal rule" of contract construction "is to ascertain the intention of the parties," OCGA § 13-2-3, and parol evidence may be considered to ascertain intent in construing an ambiguous contract. See OCGA § 13-2-2 (1); *Krogh v. Pargar, LLC*, 277 Ga. App. 35, 39 (2) (625 SE2d 435) (2005). The record contains conflicting parol evidence regarding the parties' intent. There is evidence that, as part of the 2009 loan renewal, the bank intended to require the assignments to be recorded and communicated that intent to various persons associated with DJ. Bank officer Maura McKenna deposed that she told Smithgall's son that the bank was going to require the assignments to be recorded as a condition of the loan's renewal. Pertinent to the relevance of the definition of "notes receivable," McKenna also deposed that the purpose of the collateral assignment agreement "was to govern the assignment of the notes receivable and other loan documents that were assigned to the bank for active notes," and DJ's manager agreed with the characterization of "notes receivable" as "promissory notes issued by DJ to its borrowers."

But there is also evidence in the record that, on several occasions, persons associated with DJ communicated to the bank their objections to the bank's intent, and that Smithgall's son continued to voice those objections to bank officers on the

day of the closing. Smithgall's son deposed that he recalled no recording requirement as a condition of the loan renewal, and he deposed that, although at the closing McKenna expressed a desire to record assignments, she left the issue "open-ended." For this reason, Smithgall's son did not have a clear understanding of what the 2009 loan agreement required in that regard. But Smithgall himself deposed that he reviewed and executed the 2009 loan agreement on behalf of DJ and that McKenna told him at the closing that the assignments would be held in escrow. He further deposed that he intended, under the 2009 loan agreement, for the parties to continue their previous practice of not recording the assignments except under certain circumstances, and that he believed the 2009 loan agreement so provided. "The intention of the parties may differ among themselves. In such case, the meaning placed on the contract by one party and known to be thus understood by the other party at the time shall be held as the true meaning." OCGA § 13-2-4. If the jury were to believe Smithgall's description of what he knew and was told by McKenna at the closing, it could find that the parties intended the assignments to be held in escrow.

The bank argues that parol evidence of DJ's course of conduct can resolve the ambiguity, namely evidence that DJ participated in the recording of assignments both before and after the 2009 loan agreement. See *Cohen v. Sandy Springs Crossing*

20

*Assoc.*, 238 Ga. App. 711, 712-713 (520 SE2d 17) (1999) ("the construction placed upon a contract by the parties thereto, as shown by their acts and conduct, is entitled to much weight and may be conclusive upon them") (citation and punctuation omitted). (Alternatively, the bank argues that this evidence demonstrates a waiver. We address that argument in Division 2 (a) (ii), infra.) There appears to be no dispute that the parties agreed at a September 28, 2009 meeting to record assignments on some existing underlying loans, and that they instructed the attorney who also served as DJ's closing attorney to accomplish this. The evidence, however, depicts this effort as an attempt to resolve title problems with certain existing loans. Consequently, the parties' recording of the assignments before they entered into the 2009 loan agreement is not relevant to how they intended to treat subsequent assignments under that agreement. (For this reason, we need not address the question – strongly disputed by the parties in their appellate briefs – of which party the attorney represented at the September meeting and in recording the assignments to resolve the title problems following that meeting.)

The attorney also recorded assignments on underlying loans that DJ made to its customers *after* the execution of the 2009 loan agreement. He did so in his capacity as DJ's closing attorney, see generally *Garrett v. Fleet Finance, Inc. of Ga.*,

21

252 Ga. App. 47, 51-52 (2) (556 SE2d 140) (2001) (discussing attorney-client relationship between closing attorney and lender), and there is evidence that he did so in compliance with closing instructions supplied by DJ. But there also is evidence that DJ continued to object to this practice of recording assignments and issued its closing instructions only at the bank's direction. Given these objections, we cannot say that, as a matter of law, DJ's course of conduct conclusively demonstrated its intent that the 2009 loan agreement permit or require assignments to be recorded. Compare *Cohen*, 238 Ga. App. at 712-713 (upholding summary judgment against guarantor, where guarantor admitted that he intended to guarantee a lease and acted in a way consistent with his obligations thereunder).

"In sum, the issue of whether the parties intended for the [assignments to be recorded or held in escrow] is not resolved by the application of the rules of contract construction nor by the parol evidence[,]" *Krogh*, 227 Ga. App. at 40 (2), leaving a genuine issue of fact for jury resolution regarding the interpretation of the 2009 loan agreement concerning recording the assignments. "Where complex, contested fact-issues essential to determining either the contractual intent of the parties or obscure and contradictory contract provisions are involved, the jury should find the facts."

22

*American Honda Motor Co. v. Williams & Assoc.*, 208 Ga. App. 636, 644 (5) (431 SE2d 437) (1993) (citation omitted).

(b) *Waiver of requirement to hold assignments in escrow.*

The bank argues that, even if the 2009 loan agreement required it to hold the assignments in escrow, DJ subsequently waived that requirement by instructing its closing attorney to record the assignments. Again, we find a genuine issue of material fact on this question because there is conflicting evidence as to whether DJ *voluntarily* gave its closing attorney that instruction.

"Waiver is a voluntary relinquishment of some known right, benefit or advantage, which, except for such waiver, the party otherwise would have enjoyed." *Jordan v. Flynt*, 240 Ga. 359, 366 (3) (b) (240 SE2d 858) (1977) (citation and punctuation omitted). "[A] party to a contract may waive contractual provisions for his benefit. A waiver may be established even though the acts, conduct or declarations are insufficient to establish an estoppel. Ordinarily, a waiver operates to preclude a subsequent assertion of the right waived or any claim based thereon." *AAF-McQuay v. Willis*, 308 Ga. App. 203, 217 (4) (a) (707 SE2d 508) (2011) (citations and punctuation omitted). "Waiver of a contract right may result from a party's conduct showing his election between two inconsistent rights." *Ansley v.*

23

*Ansley*, 307 Ga. App. 388, 393 (2) (705 SE2d 289) (2010) (citations and punctuation omitted). But "[i]f there is conflicting evidence over whether a waiver occurred, the issue is for a jury to resolve." *AAF-McQuay*, 308 Ga. App. at 217 (4) (a) (citation omitted).

There is conflicting evidence over whether a waiver occurred in this case. As discussed above, although the record shows that DJ instructed its closing attorney to record some of the assignments, it also contains evidence that this occurred at the bank's direction and despite DJ's objections to the procedure at the time, suggesting that DJ did not *voluntarily* relinquish any rights under the 2009 loan agreement to have the assignments held in escrow.

Our opinion in *Smith v. Gordon*, 266 Ga. App. 814 (598 SE2d 92) (2004), to which the dissent points, does not require a finding, as a matter of law, that DJ voluntarily relinquished its right to have assignments held in escrow. In *Smith* we rejected a party's "attempt[] to circumvent the waiver issue by claiming that . . . he was forced to continue with the purchase . . . and execute the promissory note or lose his investment." Id. at 816 (1) (a). Here DJ's claim is not that it reluctantly acquiesced to the bank's demands when it executed the 2009 loan agreement. DJ's claim is that it reluctantly acquiesced when the bank subsequently refused to abide

24

by the terms of that agreement. So the discussion of the sanctity of contract with which the dissent closes is misplaced. If we assume the 2009 loan agreement should be construed as DJ would construe it – and we must make that assumption for the purpose of waiver analysis, because waiver is otherwise irrelevant – it follows that the bank, and not DJ, negotiated, entered, and performed under the contract only to later refuse to be bound by its terms.

If we assume that the 2009 loan agreement is determined to include a provision requiring the bank to hold the assignments in escrow, a "jury must resolve whether [DJ's participation in the recording of the assignments] resulted in a waiver of [its] contractual rights." *AAF-McQuay*, supra at 218 (4) (a).

ii) *The second claim of breach: Failing to timely review requests for advances*.

DJ and Smithgall argue that the bank breached a provision of the 2009 loan agreement governing the timing of the bank's review of DJ's requests for advances under the line of credit. The provision requires the bank to "endeavor" to review the requests within a specific time frame. Contrary to the bank's position, we find that this provision unambiguously requires the bank to make some effort to review the requests within the designated time frame, and that a question of fact exists as to whether the bank complied with this requirement.

The provision at issue states:

If a written request [for an advance] is received by Bank prior to 11:00 a.m. (Atlanta, Georgia time) on a Business Day, Bank will endeavor to review such request prior to 5:00 p.m. (Atlanta, Georgia time) on the following Business Day, and if a written request is received after 11:00 a.m. (Atlanta, Georgia time) on a Business Day, Bank, subject to the Borrowing Base limitations and other terms and conditions of this Agreement, will endeavor to review such request prior to 5:00 p.m. (Atlanta, Georgia time) on the second Business Day following said request.

Notwithstanding this language, the bank argues that it "was not required to meet any timeline" under the 2009 loan agreement. The parties' inclusion in their agreement of time deadlines, with a degree of specificity that identifies the applicable time zone, belies this argument. The question is not whether the parties intended the bank to do *anything* within the specified times – the plain language of the 2009 loan agreement clearly states that the bank was to "endeavor" to review DJ's requests for advances. The question instead is what the parties meant by the term "endeavor."

In construing a contract, "[w]ords generally bear their usual and common signification," OCGA § 13-2-2 (2), and we discern nothing in the 2009 loan

26

agreement to indicate that the parties intended otherwise as to the term "endeavor." The Merriam-Webster dictionary pertinently defines the transitive verb "endeavor" as follows: "to seriously or continually try to do (something)" or, more fully, "to attempt (as the fulfillment of an obligation) by exertion of effort." See http://www.merriam-webster.com/dictionary/endeavor. Similarly, Black's Law Dictionary defines the term as: "[t]o exert physical and intellectual strength toward the attainment of an object or goal." Black's Law Dictionary, p. 547 (Deluxe 7th Ed. 1999). Using these common definitions for the term "endeavor," the 2009 loan agreement required the bank to make some effort to review DJ's requests for advances within the specified time frame.

The bank argues (and the trial court found) that other contract provisions granting the bank discretion in making advances to DJ essentially excused the bank from its obligation to endeavor to review requests for advances by the specified deadlines. Such construction of the 2009 loan agreement renders meaningless the deadline requirements, in contravention of OCGA § 13-2-2 (4), which directs that a construction upholding the contract in whole and in every part is to be preferred. Nor is such construction compelled by the language of the 2009 loan agreement. While the provisions to which the bank points give it discretion to approve or reject a

request, they do not afford the bank similar discretion to comply with the procedures, including the specified time frames, that the 2009 loan agreement establishes for the bank's review of a request.

There is "a common law duty to diligently and in good faith seek to comply with all portions of the terms of a contract." *Stuart Enterprises Intl. v. Peykan, Inc.*, 252 Ga. App. 231, 233 (2) (555 SE2d 881) (2001) (citations omitted). Accordingly, the bank had a duty to diligently and in good faith seek to comply with the requirement that it endeavor – in other words, make some effort – to review DJ's requests for advances within the specified time frame. DJ has pointed to evidence that a loan officer in charge of obtaining approval for DJ's requests did not take the necessary steps to have some of those requests reviewed in a timely manner. This creates a genuine issue of material fact as to whether the bank breached an obligation under the 2009 loan agreement.

iii) *The third claim of breach: Withholding cooperation in foreclosure process.*

DJ and Smithgall argue that the bank breached the loan agreement by refusing to aid DJ in foreclosing on properties securing underlying loans that were in default. They argue that the bank refused to reassign to DJ the deeds to secure debt concerning those properties or otherwise assist DJ in its foreclosure efforts. The bank

28

argues that it has no contractual duty to assist DJ in foreclosing. But the unambiguous language of the agreement imposes upon the bank a duty of care in preserving the loan collateral, and questions of fact exist as to whether the bank's alleged failure to cooperate breached that duty.

The unambiguous language of the 2009 loan agreement incorporates by reference the terms of the collateral assignment agreement. The collateral assignment agreement requires the bank "to use reasonable care in the custody and preservation of the Collateral." As with all of the provisions of the 2009 loan agreement, the bank had a duty to diligently and in good faith seek to comply with this provision. See *Stuart Enterprises International*, 252 Ga. App. at 233 (2).

The underlying loans from DJ to its borrowers comprised the collateral for DJ's line of credit from the bank. DJ and Smithgall point to evidence raising a genuine issue of material fact as to whether the bank acted in a way that impeded DJ from extracting as much value as possible from those underlying loans that went into default. There is evidence that the bank did not timely reassign to DJ deeds to secure debt on the underlying loans so that DJ could foreclose upon them. And both Smithgall and his son deposed that, despite DJ's repeated requests and McKenna's repeated promises that the bank would "fix" the foreclosure problem, the bank did not

act to do so. Instead, Smithgall described receiving the "runaround" from the bank. McKenna agreed in her deposition that the bank did "[n]ot really" take steps to address DJ's concerns regarding the impact of recording assignments.

iv) *The fourth claim of breach: Ceasing to fund DJ.*

DJ and Smithgall argue that the bank breached the 2009 loan agreement when, on May 17, 2011, it stopped advancing DJ money. The unambiguous language of the 2009 loan agreement, however, allows the bank to cease funding under certain circumstances, and DJ and Smithgall have failed to point to a evidence creating a genuine issue of material fact in response to the bank's evidence that at least one of those circumstances existed. As a result, summary judgment was appropriate on this claim.

The bank argues that the following provision of the 2009 loan agreement authorized it to stop funding DJ: "Advances of funds shall be at Bank's sole discretion, and in any event, Bank shall have no obligation to advance any funds on the Credit Line at any time after an Event of Default shall have occurred hereunder or after a default shall have occurred under the terms of any of the other Loan Documents, as hereinafter defined." The 2009 loan agreement defines "Event of Default" to include "[f]ailure of [DJ] or any Guarantor to comply with *any* covenant

or agreement contained herein[.]" (Emphasis supplied.) Accordingly, the unambiguous language of the 2009 loan agreement authorized the bank to cease funding DJ if it was in breach of any of its obligations set forth in that agreement, even if such breach was, as characterized by DJ and Smithgall,"nonmonetary" or concerning a "technical" issue.

The bank has pointed to evidence showing that DJ breached at least one of its obligations under the 2009 loan agreement – a provision that, "[a]t Bank's option, promptly after a Foreclosure Event, [DJ] shall execute and deliver to Bank . . . a deed to secure debt securing the Note and the Term Note in favor of Bank granting a first priority security position in any Real Estate Owned securing an amount equal to full value of the Note and Term Note." In a letter dated January 4, 2011, the bank warned DJ that it was not in compliance with this requirement and that it must "immediately resolve[ ]" this issue, among others, to continue to receive funding. DJ's manager deposed that DJ had not provided the bank with some of the required deeds to secure debt, and DJ and Smithgall point to no evidence that they complied with this requirement. Because there is undisputed evidence of noncompliance with at least one covenant, the bank's act of ceasing funding to DJ did not breach the 2009 loan

agreement, and the trial court did not err in granting summary judgment to the bank on this claim.

b. *Damages for breach of contract.*

As explained above, questions of fact exist as to whether the bank breached the 2009 loan agreement. The bank argues that it nevertheless is entitled to summary judgment on the breach of contract claims because there is no evidence that DJ was damaged as a result of the breach. We disagree.

DJ and Smithgall have pointed to evidence that the bank's alleged breaches harmed DJ by, among other things, damaging its relationships with its customers, affecting its competitiveness in the hard-money loan market, and causing it to lose business.

3. *Remaining claims.*

DJ and Smithgall raise several other claims of error related to the trial court's grant of summary judgment in favor of the bank on their action against the bank and the bank's counterclaim. As detailed below, the genuine issues of material fact that preclude summary judgment on three of the claims for breach of contract also preclude summary judgment on these remaining claims.

a. *DJ's obligation to perform under the 2009 loan agreement.*

DJ and Smithgall sought a declaration that DJ was not obligated to perform under the 2009 loan agreement due to the bank's breaches, and the bank counterclaimed for repayment of the loan under the agreement. The trial court granted summary judgment to the bank on both issues. Given our determination that genuine issues of material fact exist regarding whether the bank breached that agreement, we reverse that ruling. See generally *West v. Koufman*, 259 Ga. 505, 506 (384 SE2d 664) (1989) (party's breach of duty of good faith and fair dealing implied in all contracts could preclude him from insisting on other party's strict compliance with contract terms).

b. *Enforceability of the Smithgall guaranty.*

DJ and Smithgall sought a declaration that the Smithgall guaranty was unenforceable, and the bank counterclaimed to enforce the guaranty. The guaranty imposed an obligation upon Smithgall to make payments upon the bank's demand "if the Note is not punctually paid by [DJ] in accordance with its terms, or if any other amounts shall hereafter become due by [Smithgall] pursuant to the terms hereof, *for any reason other than due to the gross negligence or willful misconduct of Lender*." (Emphasis supplied.) The trial court held that the guaranty was enforceable, finding that the bank had "acted properly under the parties' agreements and [had] not

33

breached the agreements" and concluding that, because the bank "was entitled to take the actions that it did, those actions cannot be held to be gross negligence or willful misconduct."

As set forth above, however, questions of fact exist as to whether the loan agreement authorized the bank to take the actions about which DJ and Smithgall complain, namely recording the assignments, failing to timely review advance requests, and failing to cooperate with DJ in its efforts to foreclose on or otherwise preserve the collateral for underlying loans that were in default. And we agree with DJ and Smithgall that the question of whether these actions rose to the level of gross negligence or wilful misconduct is for the jury. See *Currid v. DeKalb State Court Probation Dept.*, 274 Ga. App. 704, 709 (2) (a) (618 SE2d 621) (2005) ("When facts alleged as constituting gross negligence are such that there is room for difference of opinion between reasonable people as to whether or not negligence can be inferred, and if so whether in degree the negligence amounts to gross negligence, the right to draw the inference is within the exclusive province of the jury.") (citation and punctuation omitted). We therefore reverse the trial court's grant of summary judgment to the bank on the claim and counterclaim concerning the enforceability of the Smithgall guaranty.

34

c. *Other declaratory relief.*

DJ and Smithgall sought declaratory relief on two other issues: (1) whether and how the value of properties securing underlying loans should figure into the calculation of what DJ owes the bank under the loan agreement, as to those properties for which the bank has a recorded assignment of the deed to secure debt; and (2) whether, under the loan agreement, the bank has any rights to properties securing underlying loans for which it reassigned the deed to secure debt back to DJ. The trial court held that the bank was entitled to summary judgment on these claims for declaratory relief because "it is clear that the [assignments] were to be recorded." This was error, because the question of whether the bank could record the assignments has no bearing on how the value of properties with recorded assignments should be treated in calculating the amount (if any) due to the bank under the 2009 loan agreement, or whether the bank retained any interest in properties that it had reassigned back to DJ. Although the bank makes other arguments in support of the trial court's ruling on these issues, we decline to engage in a "right for any reason" analysis because the interests of judicial economy are not implicated here – the issues upon which DJ and Smithgall sought declaratory relief may be considered on remand in the context of the bank's counterclaim under the 2009 loan agreement. See

35

Division 3, supra; see also *Meadow Springs v. IH Riverdale*, 307 Ga. App. 72, 76 (2) (704 SE2d 239) (2010). Accordingly, we reverse the trial court's grant of summary judgment to the bank on these claims for declaratory relief.

d. *Attorney fees and costs of litigation.*

Each side sought attorney fees from the other under OCGA § 13-6-11, arguing, among other things, that the other side engaged in bad faith; the bank also sought attorney fees under OCGA § 13-1-11 and the loan agreement. In light of its rulings in favor of the bank on summary judgment, the trial court denied attorney fees to DJ and Smithgall and awarded them to the bank under OCGA § 13-1-11 (a) (2) (providing for payment of indebtedness upon note or other evidence of indebtedness). "Based upon our conclusion that the trial court erred, in part, by granting summary judgment in favor of the [bank], we must vacate the trial court's attorney fees award [to the bank]." *Hearn v. Dollar Rent A Car*, 315 Ga. App. 164, 175 (2) (a) (726 SE2d 164) (2012) (citation omitted).

Where, as here, "a bona fide controversy exists, attorney's fees may be awarded under OCGA § 13-6-11 only where the party sought to be charged has acted in bad faith in the underlying transaction." *Latham v. Faulk*, 265 Ga. 107, 108 (2) (454 SE2d 136) (1995) (citation omitted). "Questions as to whether the defendant has acted in

36

bad faith [for the purpose of awarding attorney fees under OCGA § 13-6-11] are generally for the jury to decide." *Merlino v. City of Atlanta*, 283 Ga. App. 186, 191 (4) (657 SE2d 859) (2008). Accordingly, we reverse the grant of summary judgment to the bank on the attorney fee claim brought by DJ and Smithgall.

*Judgment affirmed in part, reversed in part, and vacated in part, and case remanded with direction. Barnes, P. J. and Ellington, P. J., concur. Miller, J., concurs. Boggs, Ray, and Branch, JJ., concur in part and dissent in part.*

A13A1046. DJ MORTGAGE, LLC et al. v. SYNOVUS BANK BO-053 d/b/a BANK OF NORTH GEORGIA.

BOGGS, Judge, concurring in part and dissenting in part.

I agree that the trial court erred in granting summary judgment on appellants' claims for failure to review requests for advances in a timely fashion and for failure to cooperate in the foreclosure process, since some evidence in the record supports these claims. And I agree that the trial court correctly granted summary judgment on appellants' claim for termination of funding. However, I believe the trial court also correctly granted summary judgment on appellants' claim for alleged wrongful recording of assignments. I therefore respectfully dissent to the reversal of summary judgment on that portion of appellants' claim.

First, the construction of the contract provisions relating to the recordation of the bank's assignment presents no ambiguity for resolution by a jury. As the majority acknowledges, the construction of a contract is a three-step process, and "if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity." (Citation and punctuation omitted.) *City of Baldwin v. Woodard & Curran, Inc.*, 293 Ga. 19, 30 (3) (743 SE2d 381) (2013). Only if that analysis fails may a jury consider the issue. Id. Here, application of the rules of contract construction eliminates any supposed ambiguity.

> [T]he fundamental rule, the rule which swallows up almost all others in construing a contract, is to give it that meaning which will best carry into effect the intent of the parties. This is the object of the rules of interpretation, to discover the true intent of the parties, and in doing this we are to consider the language of the parties' agreement with the surrounding circumstances. In construing contracts, courts should look to the substantial purpose which apparently influenced the minds of the parties, rather than at the details of making such purpose effectual.

(Citations and punctuation omitted.) *McLendon v. Priest*, 259 Ga. 59, 60 (376 SE2d 679) (1989). And in construing the contract, we "consider the background of the contract and the circumstances under which it was entered into, particularly the

2

purpose for the particular language to be construed." (Citations and punctuation omitted.) *Horwitz v. Weil*, 275 Ga. 467, 469 (569 SE2d 515) (2002).

Here, as the majority notes, the parties entered into a "Second Amended and Restated Loan and Line of Credit Agreement" in 2009. The expressed purpose was "to renew both the line of credit facility and the term promissory note facilities and refinancing said facilities in accordance with the terms and conditions contained in this Agreement." It is undisputed that, by late 2008, the bank had become concerned about DJ's performance and slow payment. In an attempt to "shore up the bank's interest in this loan," the bank decided "to have transfers and assignments recorded." In Georgia, a recording state, the bank has no protection without recordation. See OCGA § 44-2-2 (b).[1]

The 2009 agreement provides: "'Transfer Documents' shall have the meaning assigned to such term in the Collateral Assignment." The parties executed a "Collateral Assignment" agreement in 2007, and modified it in 2008 and 2009. The original 2007 collateral assignment agreement parenthetically provides that the transfer documents shall be held in escrow. But that parenthetical provision is not part

---

[1]The 2009 modification to the Collateral Assignment agreement recites that the intention of the parties was to improve the bank's security in the refinancing.

of the definition of "Transfer Documents," which were already defined in the preceding sentence as "Underlying Loan Documents acceptable to Lender." Rather, it explains what the parties agreed to with respect to the transfer documents *in 2007*.

The 2009 agreement substantially alters the bank's treatment of the transfer documents. It defines "Note Receivable" provisions in different terms from those of the 2007 agreement. In 2009, a "Note Receivable" is redefined as a note, instrument or other obligation "which meets each of the following requirements." One of the requirements is that the original of the "Underlying Note and Underlying Security Instrument . . . *shall be recorded* in the applicable jurisdiction." (Emphasis supplied.) This new agreement superseded the terms of the same paragraph of the 2007 agreement, which provided only that the documents were to be "in recordable form." As the trial court observed: "A contract containing a term inconsistent with a term of an earlier contract between the same parties is interpreted as including an agreement to rescind the inconsistent term in the earlier contract." Williston on Contracts § 73.17. While the majority contends that this rule is "inapposite" because the adoption of the definition of "Transfer Documents" is a term of the 2009 agreement, this is not the case to the extent the provisions of the contracts conflict. 13 Corbin on Contracts § 71.1 (5) addresses the situation presented here: "[A] new contract may adopt and

4

include a part of the antecedent one. Consequently, the two contracts must be construed together. *Insofar as they are inconsistent, the later one prevails.*" (Emphasis supplied.) See also *Wallace v. Bock*, 279 Ga. 744, 746 (1) (620 SE2d 820) (2005) (subsequent agreement not substituted contract but modification of original contract). The 2009 contract adopted the former definition of "Transfer Documents" only to the extent it did not conflict with the substantial revision of the 2007 provisions in 2009.

The other 2009 provisions pointed to by the majority are not in conflict with the recordation provision because they simply enumerate recordation as one of the broad and cumulative list of actions which *may* be taken *at the bank's option* in the event of a default, or in order "to perfect [the] bank's interest in the underlying security instrument."

Considering the 2009 contract as a whole and in light of the parties' intent at the time, no ambiguity remains. Recordation of the transfers was intended as part of the 2009 agreement, and was necessary to effectuate the new agreement. Any parol evidence regarding appellants' intent is therefore irrelevant, particularly belated assertions that a party understood the contract differently. The majority's reliance on OCGA § 13-2-4 is misplaced, because it "can have no application unless the contract

is ambiguous. [Cit.]" *Dorsey v. Clements*, 202 Ga. 820, 822 (44 SE2d 783) (1947) (decided under former Ga. Code Ann. §20-703). Here, as noted above, the rules of contract construction have eliminated any ambiguity.

Most importantly, however, undisputed evidence demonstrates that appellants waived any claim of wrongful recordation by their conduct under the terms of the contract.

> A waiver may be express, or may be inferred from actions, conduct, or a course of dealing. Waiver of a contract right may result from a party's conduct showing his election between two inconsistent rights. Acting on the theory that the contract is still in force, as by continuing performance, demanding or urging further performance, or permitting the other party to perform and accepting or retaining benefits under the contract, may constitute waiver of a breach. However, all the attendant facts, taken together, must amount to an intentional relinquishment of a known right, in order that a waiver may exist.

(Citations, punctuation, and footnote omitted.) *Smith v. Gordon*, 266 Ga. App. 814, 815 (1) (a) (598 SE2d 92) (2004).

Here, as the majority acknowledges, it is undisputed that DJ instructed its attorney to record the transfer documents for all loans made after the 2009 agreement, and that those documents were recorded. The record includes closing instructions

6

from DJ instructing its attorney to "Record Deed to Secure Debt" and "RECORD the Assignment of Security Deed and Allonge." The majority, however, asserts that this repeated action in accordance with the terms of the 2009 contract was not a "voluntary" action because it "occurred at the bank's direction and despite DJ's objections."

Similarly, the appellant in *Smith*, supra, sought to avoid a clear waiver of a claim for breach of a contract provision "by claiming that he did not intentionally relinquish his known right" because he was obliged to execute the contract in order to avoid losing his investment. We rejected this argument, observing: "One may not void a contract on grounds of duress merely because he entered into it with reluctance, the contract is very disadvantageous to him, the bargaining power of the parties was unequal or there was some unfairness in the negotiations preceding the agreement." (Citations, punctuation, and footnote omitted.) Id. at 816.

DJ's performance under the contract was not rendered "involuntary" because it objected to the recordation provision but nevertheless complied with it. DJ had the choice – though not perhaps a pleasant or easy one – to find another lender rather than renegotiate the terms of its existing loan. Instead, DJ chose to comply with the bank's requirements *and reap the benefits of the agreement.* It thereby waived any

7

claim it had for alleged breach. That the agreement was in some respects disadvantageous to DJ does not create a question of fact as to "voluntariness." A party cannot negotiate, enter into and perform under a contract, only to later claim that it objected to some provision of the contract and thus retained a mental reservation to the terms of the agreement. Such a holding creates the risk that any disgruntled party may belatedly assert a lack of "voluntary" assent to a contract that it executed and performed. This is not the law in Georgia.

For these reasons, I respectfully dissent.

I am authorized to state that Judge Ray and Judge Branch join in this dissent.