**SECOND DIVISION**
**BARNES, P. J.,**
**MILLER, and RAY, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**March 25, 2014**

# In the Court of Appeals of Georgia

A13A2150. CALLAWAY et al. v. GARNER et al.

BARNES, Presiding Judge.

Following a bench trial, the trial court ordered the estate of Cason J. Callaway, Jr. (the "Callaway Estate") to specifically perform an agreement to purchase shares of Callaway Blue Springs Water Company ("Callaway Blue") from two shareholders for $1,200,000 and awarded the shareholders prejudgment interest and attorney fees. The Callaway Estate now appeals, contending that the trial court erred in granting specific performance of the stock purchase agreement and in awarding prejudgment interest and attorney fees. For the reasons discuss below, we affirm the trial court's grant of specific performance and award of prejudgment interest, but we reverse the court's award of attorney fees.

"On appeal from the entry of judgment in a bench trial, we view the evidence in the light most favorable to the trial court's verdict." *Westmoreland v. JW, LLC*, 313 Ga. App. 486, 487 (722 SE2d 102) (2012). We will affirm a trial court's factual

findings in a bench trial if there is any evidence to support them because "[s]uch a standard gives the proper deference to the trial court, which is in the best position to judge the credibility of witnesses." *Cox v. Bayland Properties, LLC*, 293 Ga. App. 612, 613 (1) (667 SE2d 452) (2008). Mindful of this deferential standard, we turn to the evidence presented at the bench trial in this case.

*The Course of Dealing Between the Garners and Mr. Callaway.* Larry Garner, Sr., and his son, Larry Garner, Jr., have operated a family construction business for many years. Through their company, Garner Construction, the Garners began a relationship with Cason J. Callaway, Jr. ("Mr. Callaway") in the 1980s through a series of construction projects commissioned by him. During the course of their 20-year business relationship, the Garners performed 40 to 60 construction projects for Mr. Callaway. Almost all of the projects were performed on an oral agreement confirmed by a handshake and without written contracts. The Garners and Mr. Callaway never had a dispute over their 20-year history of conducting business through oral agreements.

*Callaway Blue.* Since the 1930s, the Callaway family has owned property in Harris County, Georgia, containing a natural spring. In the late 1990s, the Garners and Mr. Callaway began discussing the possibility of using the natural spring to start

2

a commercial spring water bottling business. The Garners and Mr. Callaway ultimately formed a water bottling business, Callaway Blue, and they entered into a shareholders' agreement in 2001 that placed certain restrictions on the sale of their stock (the "2001 Shareholders' Agreement").

Larry Garner, Jr. served as Chief Operating Officer and President of Callaway Blue. At the time of the events at issue in this litigation, the Board of Directors of Callaway Blue included Mr. Callaway, his wife, and his four children, with Mr. Callaway serving as Chairman and Chief Executive Officer.

*Stock Ownership in Callaway Blue.* Initially, the Garners owned 45 percent of Callaway Blue and Mr. Callaway owned 55 percent. In 2002 and 2003, stock was issued to Mr. Callaway's wife and his four children.

In 2003, Mr. Callaway agreed to purchase 6,000 shares of Callaway Blue from Larry Garner, Sr. for $200 per share. The sale was completed by Mr. Callaway delivering a personal check for $1.2 million. There were no written contracts prepared to memorialize the stock sale.

In 2004, non-voting shares of Callaway Blue were issued and sold to Callaway family members and were valued at $180 per share. In addition to the Callaway

family members who already owned stock, non-voting shares were issued and sold to Mr. Callaway's grandchildren.

*The 2004 Shareholders' Agreement.* In October 2004, an amended shareholders' agreement was executed by the then-current shareholders – the Garners, Mr. Callaway, his wife, and his four children (the "2004 Shareholders' Agreement"). The 2004 Shareholders' Agreement contained stock transfer restrictions and retained many of the terms of the original 2001 Shareholders' Agreement, including a section limiting any shareholder from transferring shares in Callaway Blue to anyone (including another shareholder), other than to the shareholder's spouse or lineal descendants. Section 4 of the 2004 Shareholders' Agreement addressed "impermissible transfers" and provided Callaway Blue and the other shareholders with an option to buy "all[] of the Stock attempting to be transferred" within a certain time period after receiving notice of the impermissible transfer. Section 5 established a specific procedure for computing the value of the stock in the event that Callaway Blue or the other shareholders decided to exercise their option. The 2004 Shareholders' Agreement stated that any transfer carried out in a manner not "in accordance with this Agreement" would be "void and ineffective."

4

The 2004 Shareholders' Agreement further provided that "[a]ll notices, . . . waivers and other acts under this Agreement shall be in writing" and that its terms could be amended "only . . . by a subsequent written agreement executed by all of the then shareholders of the Stock then outstanding." Additionally, the 2004 Shareholders' Agreement stated that "After-Acquired Stock," including "non-voting shares," would be subject to its terms. Hence, when some of Mr. Callaway's grandchildren purchased non-voting shares in Callaway Blue later in 2004, those shares were covered by the 2004 Shareholders' Agreement.

*The Role of Ken Callaway.* Mr. Callaway was 76 years old when he formed Callaway Blue with the Garners, and his health declined over the ensuing years. Consequently, in 2005, Mr. Callaway asked his son, Ken Callaway, to serve as his "eyes and ears" and assist him in handling his business and personal affairs. Mr. Callaway also executed a power of attorney authorizing his children to make decisions and manage his affairs for him. Nevertheless, despite his health problems, Mr. Callaway continued to participate in Callaway Blue and still "generally did what he wanted to do" without interference from other family members.

After his father spoke with him about his declining health, Ken Callaway began appearing at Callaway Blue to stay apprised of the business, and, in 2006, he was

5

placed on the corporate payroll as a "family representative" and became "involved with the day to day and overall operations of the water company." Ken Callaway would report all significant business matters involving his father to his mother and his three siblings.

*Negotiations Regarding the Sale of the Garners' Stock.* Ken Callaway and the Garners did not get along with one another. After observing that Ken Callaway was "becoming more and more involved in the company," Larry Garner, Jr. advised the Callaway family that he had taken Callaway Blue as far as his skills would allow and that he wanted to sell the remainder of his shares and relinquish his role as President. In response, the Callaway family had a meeting to discuss the purchase of Larry Garner, Jr.'s shares and decided to hire an appraiser to value them.

On September 1, 2006, the Callaway family made a written offer to purchase Larry Garner, Jr.'s shares for $55 per share based on an appraisal of the stock that they had obtained. The offer letter was signed by Mr. Callaway, his wife, and his four children. Attached to the offer was a draft "letter of intent" that specified three "conditions precedent" to closing on the sale.

Larry Garner, Jr. rejected the $55 offer on September 6, 2006, but negotiations continued over the proper valuation of the stock and included discussions of the

Callaway family purchasing the remaining shares of both Garners. On January 26, 2007, Larry Garner, Jr. sent a letter to Ken Callaway discussing the valuation of the shares and noting that it was his intent to "faithfully follow[] the procedures outlined in our Shareholders' Agreement." Ken Callaway responded in a letter to Larry Garner, Jr. on January 30, 2007, advising, among other things, that the "Shareholders' Agreement does not apply to the facts and circumstances" and that "Section 4 of the . . . Shareholders' Agreement . . . does not prohibit the type of transfer we have been considering since [the summer of] 2006."

*The January 31, 2007 Meeting and "Handshake" Agreement.* At Mr. Callaway's request, a face-to-face meeting was scheduled for January 31, 2007 to come to a final agreement with the Garners on the stock price. Bob Hidell and Kathy Ransome, two consultants with experience in valuing water bottling companies, were asked to moderate the meeting. With both parties' permission, Hidell and Ransome also agreed to represent the Garners and assist them in evaluating any offer made by the Callaway family.

Hidell and Ransome sent written notice of the January 31, 2007 meeting to the "Members of the Callaway Family" and "Members of the Garner Family." The letter stated that the contemplated negotiations between the Callaway family and the

7

Garners during the meeting "cannot be considered to be within the framework established by the [2004 Shareholders' Agreement]," but advised that the 2004 Shareholders' Agreement would "remain[] in full force and effect without modification or nullification" if no agreement to purchase the Garners' shares was reached at the meeting.

The January 31, 2007 meeting was held at Callaway Blue and was attended in-person by Mr. Callaway, the Garners, Ken Callaway, and Mr. Callaway's personal secretary. Hidell and Ransome participated in the meeting by speaker phone.

The substance of the meeting was the subject of the testimony of several witnesses at trial. During the meeting, the Callaway family reiterated that their appraiser had valued the Garners' stock at $55 per share, while the Garners argued that their appraiser had demonstrated that the stock was worth $253 per share. According to the Garners, after both families set out their competing valuations of the stock, Mr. Callaway on his own offered to purchase their remaining stock for $160 per share, for a total offer price of $1.2 million. The Garners left the room to discuss the offer with Hidell and Ransome by cell phone. Hidell and Ransome advised them to accept the offer. The Garners then returned to the room and accepted the offer made by Mr. Callaway alone.

The Garners testified that after they accepted the offer, Mr. Callaway said that he could pay $750,000 at closing but would need some additional time to sell some real estate to pay the balance of $450,000. The Garners told Mr. Callaway that they were willing to allow the purchase price to be made in two payments to give him time to come up with the cash to pay for their stock. According to the Garners, they simply gave Mr. Callaway time to raise the money to pay the $450,000 balance as an accommodation to him, but never agreed that the enforceability of the stock purchase agreement would be conditioned on his ability to sell some of his real estate. There was no discussion in the meeting of any additional terms or of the desire to reduce the agreement to a definitive written agreement. At the end of the meeting, the Garners shook Mr. Caldwell's hand and thanked him for concluding the deal, as was their customary practice in business dealings with Mr. Caldwell. The Garners testified that the stock purchase agreement was completed with the handshake confirming the binding obligation of Mr. Callaway to pay $1.2 million for their stock without condition.[1]

---

[1] There also was testimony that despite his health problems, Mr. Callaway was of sound mind when he agreed to purchase the Garners' stock.

*The February 1, 2007 Letter.* On February 1, 2007, Ken Callaway sent a "letter of intent" to the Garners in which he sought to spell out the terms of the agreement that had been reached between the Garners and his father the previous day. The letter referred to the "handshake agreement" that had been reached and, among other things, stated that "[t]he price will be $160.00 per share or $1,200,000 to be paid as follows: $750,000 cash at closing[,] $400,000 to be paid as soon as real estate owned by [Mr. Callaway] is sold and the proceeds are available to complete the purchase." In contrast to the draft letter of intent that had been sent by the Callaway family to the Garners in September 2006, the February 1, 2007 letter did not refer to any "conditions precedent."[2]

After receiving the February 1, 2007 letter, the Garners corrected the second payment to "$450,000" and signed the letter, as Ken Callaway had requested. Ken Callaway then sent a letter to his family's counsel advising him of the purchase agreement and requesting that closing documents be prepared for the transaction.

---

[2] The final paragraph of the February 1, 2007 letter noted certain additional terms that would be included in the documents that would be drawn up by legal counsel "to complete the transaction." The Garners testified that none of these terms were important or essential to the deal.

*Efforts by the Callaway Family to Reach an Alternative Deal.* During the January 31, 2007 meeting, Ken Callaway had not voiced any objection to his father's agreement to pay the Garners $1.2 million for their stock. However, Ken Callaway believed that his father had made a poor business decision and had overvalued the Garners' shares, and he was concerned that the obligation to pay the Garners $1.2 million would create a cash liquidity crisis for his father. Consequently, he took a "leadership role" on behalf of the family "to figure . . . out" an alternative structure for the stock purchase.

Ken Callaway's plan to avoid the liquidity crisis was to have other family members buy the Garners' stock instead of Mr. Callaway. Mr. Callaway's grandchildren had trusts that had been created in their names. On February 5, 2007, Ken Callaway sent a letter to Mr. Callaway's grandchildren advising them of the negotiations that had occurred with the Garners over the course of 2006 and noting that Mr. Callaway had now "negotiated a price of $160 to buy all remaining shares the Garners own." Ken Callaway informed the grandchildren that they now had an opportunity to buy the Garners' stock for that amount through their trusts, which "would place all outstanding shares in the hands of the family." He encouraged the

grandchildren to contact the trustee who administered the trusts "as soon as possible" about the matter.

Ultimately, in early March 2007, Ken Callaway made an offer on behalf of the family to purchase the Garners' shares for $1.1 million. Under the proposed deal, "the family [would] buy the stock" rather than have "Mr. Callaway . . . as the buyer," and the deal would involve full payment of the purchase price at closing rather than waiting for real estate to be sold. The Garners rejected the offer and reiterated that their deal was for $1.2 million with Mr. Callaway alone.

*The Inventory Issue.* In March 2007, Ken Callaway learned of an error in the 2006 year-end financials regarding the inventory of Callaway Blue. After the Callaway family and the Garners failed to reach an alternative agreement for the purchase of their stock, Ken Callaway and his three siblings sent a letter to the Garners on March 28, 2007 indicating that the stock purchase agreement between the Garners and Mr. Callaway was being canceled due to the inventory error and that a "revised offer" would need to be considered using restated financials. However, there was evidence later presented at trial that the inventory levels were not considered at any time leading up to the making of the stock purchase agreement between the

12

Garners and Mr. Callaway, and there was appraiser testimony that the inventory error did not materially impact the value of the stock.

Mr. Callaway did not sign the March 28, 2007 letter sent to the Garners by his children, and during a meeting that he had with his personal secretary on March 29, 2007, Mr. Callaway stated that "Ken wasn't doing what he was supposed to do" and that "he needed to have it out with Ken." Mr. Callaway asked his secretary to call the Garners and reiterate that he would purchase their stock for $1.2 million, but she never called them.

On March 30, 2007, the Board of Directors of Callaway Blue, made up of the Callaway family, removed Larry Garner, Jr. as President. Ken Callaway was elected President of Callaway Blue.

*The Litigation.* After receiving the March 28, 2007 cancellation letter from the Callaway family, the Garners sent a written demand to Mr. Callaway insisting upon performance of his agreement to purchase their shares for $1.2 million, but the demand was refused. The Garners thereafter commenced the instant action against Mr. Callaway seeking specific performance of their stock purchase agreement,

prejudgment interest, and attorney fees under OCGA § 13-6-11.[3] Mr. Callaway died during the course of the litigation, and the executors of his estate were substituted as parties to the action. Following a bench trial spanning several days, the trial court entered a detailed final order requiring the Callaway Estate to specifically perform the agreement reached on January 31, 2007 to purchase the Garners' stock for $1.2 million and awarding the Garners prejudgment interest and attorney fees. This appeal by the Callaway Estate followed.

1. The Callaway Estate contends that the trial court erred in granting specific performance "because the sale of unspecified real estate was a material element" of the stock purchase agreement reached between the Garners and Mr. Callaway. Specifically, the Callaway Estate asserts that the uncontroverted evidence shows that Mr. Callaway's sale of real estate to fund the stock purchase was a condition precedent to the parties' agreement. The Callaway Estate further asserts that the parties' agreement was unenforceable as a matter of law because there was never a meeting of the minds as to the identity of the real estate that Mr. Callaway was to sell as a condition precedent to his purchase of the Callaway Blue stock, and thus no

---

[3] Ken Callaway also was initially named as a defendant, but he was later dismissed from the action.

14

meeting of the minds as to an essential term of the stock purchase agreement. We are unpersuaded because there was evidence that an unconditional stock purchase agreement was formed between the Garners and Mr. Callaway at the January 31, 2007 meeting, and that the parties' discussion of real estate went merely to the timing of payment and was not a condition precedent to the sale.

Central to our analysis is the fact that Georgia courts have long recognized a material distinction between a condition precedent and a mere accommodation between the parties over the timing of payment. See *Eaton v. Yarborough*, 19 Ga. 82, 83 (1855); *L. Gregg Ivey, Inc. v. Land*, 148 Ga. App. 667, 669 (3) (252 SE2d 88) (1979); *Rosing v. Dwoskin Decorating Co.*, 141 Ga. App. 617, 619 (2) (234 SE2d 128) (1977); *MacLeod v. Belvedale, Inc.*, 115 Ga. App. 444, 446 (3) (154 SE2d 756) (1967). See also *Powell Co. v. McGarey Group, LLC*, 508 F. Supp.2d 1202, 1210-1213 (N.D. Ga. 2007) (discussing Georgia cases). "A condition precedent must be performed before the contract becomes absolute and obligatory upon the other party." *Fulton County v. Collum Properties*, 193 Ga. App. 774, 775 (1) (b) (388 SE2d 916) (1989), quoting OCGA § 13-3-4. See *L. Gregg Ivey, Inc.*, 148 Ga. App. at 669 (3) ("When the existence of a debt is conditional on the happening of some event, payment cannot be enforced until the event happens[.]") (citation and punctuation

15

omitted). Moreover, if a contractual provision was intended by the parties to serve as a condition precedent but its terms are indefinite and uncertain, the contract is unenforceable as a matter of law. See *Lemming v. Morgan*, 228 Ga. App. 763, 764-765 (1) (492 SE2d 742) (1997); *Dale's Shoe Store v. Dale*, 104 Ga. App. 371, 372 (121 SE2d 695) (1961).

In contrast, an understanding reached between contracting parties over payment may simply be "for the purpose of specifying a time of payment" rather than a condition precedent. *MacLeod*, 115 Ga. App. at 446 (3), quoting *Eaton*, 19 Ga. at 83. While the distinction may be subtle, it is crucial; if the parties' understanding was merely to specify a time of payment based on the happening of a particular event, if the event "does not happen," the payor is still obligated to pay and must do so "within a reasonable time." Id. See *L. Gregg Ivey, Inc.,* 148 Ga. App. at 669 (3); *Rosing*, 141 Ga. App. at 619 (2).

When there is conflicting evidence regarding whether a party's obligation to perform under a contract was dependent upon a condition precedent, it is a matter for the trier of fact to decide. See *Petkas v. Wright Co.*, 87 Ga. App. 189, 193 (3) (73 SE2d 224) (1952). "Furthermore, under Georgia law, conditions precedent are not favored in interpreting contracts, and, thus, courts shall construe contracts to avoid

16

their harsh affects." *Powell Co.*, 508 F. Supp.2d at 1212, citing *Choate Constr. v. Ideal Elec. Contractors*, 246 Ga. App. 626, 628 (3) (541 SE2d 435) (2000).

Here, as previously discussed, the Garners testified that at the January 31, 2007 meeting, Mr. Callaway offered to purchase all of their remaining shares of Callaway Blue stock for $1.2 million, that they accepted his offer without any conditions or other terms attached, and that their verbal "handshake" agreement was consistent with their prior course of dealing. The Garners further testified that the discussion over the sale of real estate to fund the purchase occurred only *after* the stock purchase agreement had been formed, and that they simply gave Mr. Callaway some time to sell the real estate as an accommodation to him and never intended for the enforceability of the stock purchase agreement to be conditioned on the sale. The Garners' version of events was confirmed by the deposition testimony of Hidell and Ransome, both of whom participated in the January 31, 2007 meeting.[4]

We conclude that this testimony was sufficient to authorize the trial court to find that Mr. Callaway verbally agreed to pay $1.2 million for the Garners' remaining stock without condition, and that the discussion over the sale of real estate went

---

[4] The depositions of Hidell and Ransome were admitted into evidence at trial and thus were made a part of the trial record.

17

merely to the timing of payment and thus had no effect on the enforceability of the oral contract. See generally *Rome v. Polyidus Partners LP*, 322 Ga. App. 175, 178 (2) (744 SE2d 363) (2013) ("Where there is a conflict in the evidence as to the existence of an oral contract or as to its terms, the matter must be submitted to [the trier of fact] for resolution.") (citation and punctuation omitted); *Thompson v. Floyd*, 310 Ga. App. 674, 681 (2) (713 SE2d 883) (2011) ("A contract need not be in writing to be valid, but may be enforceable even though it rests only in words as remembered by the witnesses.") (citation and punctuation omitted). While there was conflicting testimony from Ken Callaway and Mr. Callaway's personal secretary regarding the terms of the agreement reached at the January 31, 2007 meeting, "[i]t is the function of the trier of fact to resolve any conflicts in the testimony of witnesses," and "[w]e will not substitute our judgment for that of the trial court." *Bowen Builders Group v. Reed*, 252 Ga. App. 54, 56 (555 SE2d 745) (2001).

The Callaway Estate also focuses on the language of the February 1, 2007 self-styled "letter of intent" sent from Ken Callaway to the Garners in asserting that the sale of real estate was a condition precedent to the stock purchase agreement. But the February 1, 2007 letter was authored by Ken Callaway, not Mr. Callaway, and it did not constitute the contract between the parties; rather, there was evidence that the

18

binding and enforceable contract was the verbal agreement reached between the Garners and Mr. Callaway at the January 31, 2007 meeting. See generally *Brooks Peanut Co. v. Great Southern Peanut, LLC*, 322 Ga. App. 801, 806 (1) (746 SE2d 272) (2013) (noting that "the execution of [a] document is not an act necessary to the creation of an enforceable contract"). Thus, the February 1, 2007 was just one of "the circumstances surrounding the making of the contract" which could be considered along with other "correspondence and discussions" in determining the contractual terms to which the parties mutually assented. *McKenna v. Capital Resource Partners, IV, LP*, 286 Ga. App. 828, 832 (1) (650 SE2d 580) (2007). See *Turner Broadcasting Sys. v. McDavid*, 303 Ga. App. 593, 597 (1) (693 SE2d 873) (2010).

In any event, the trial court was authorized to find that the February 1, 2007 "letter of intent" authored by Ken Callaway was consistent with the Garners' testimony that Mr. Callaway verbally agreed to pay $1.2 million for the Garners' remaining stock without condition, and that the discussion over the sale of real estate went only to the timing of payment. In this respect, it is worth comparing the February 1, 2007 "letter of intent" with the September 1, 2006 "letter of intent" sent to the Garners by the Callaway family, including Ken Callaway. The September 1, 2006 letter identifies three specific "conditions precedent" to closing, but the

19

February 1, 2007 letter never uses the term "condition precedent" and instead simply notes that the second payment will occur "as soon as" real estate is sold. The failure to include the "conditions precedent" language in the February 1, 2007 letter was some evidence that the sale of real estate was not viewed as a condition to the purchase of the Garners' shares. See *Flynt v. Life of South Ins. Co.*, 312 Ga. App. 430, 436 (1) (718 SE2d 343) (2011) (when parties use certain contractual language in one circumstance but not another, omission of language "should be treated as a matter of considered choice") (physical precedent only). See also *Wilcox v. Turner*, 51 Ga. App. 523, 529-530 (181 SE 95) (1935) (payment agreed to occur "as soon as possible" construed to mean within a reasonable time rather than as condition precedent).

Furthermore, there was evidence that Ken Callaway, despite his testimony at trial to the contrary, believed that an unconditional, binding agreement had been reached between the Garners and his father. After February 1, 2007, Ken Callaway wrote to his family's attorney and reported, "We have reached an agreement with Larry Garner, Sr. and Larry Garner, Jr. to purchase their remaining 7500 shares of Callaway Blue stock for $1,200,000." Callaway Blue's accountant also testified that he heard Ken Callaway say that an agreement had been reached with the Garners to

20

purchase their shares. Moreover, Ken Callaway wrote to his nieces and nephews on February 5, 2007 advising them that "Grandpa has negotiated a price of $160 to buy all remaining shares the Garners own." Thus, separate and apart from the February 1, 2007 letter, there was evidence that Ken Callaway understood that an unconditional agreement had been reached between the Garners and Mr. Callaway.

For these combined reasons, the trial court committed no error in its findings regarding the terms of the contract reached between the Garners and Mr. Callaway. As we have repeatedly emphasized, this Court exists only for the correction of errors of law and has "no authority to determine the mere weight of the evidence." *Turner Broadcasting Sys.*, 303 Ga. App. at 604 (1) (b). Accordingly, we defer to the trial court's resolution of the conflicting evidence and conclude that the court was entitled to find that on January 31, 2007, Mr. Callaway entered into a binding, unconditional contract to purchase the Garners' shares in Callaway Blue for $1.2 million.

2. The Callaway Estate also contends that the trial court erred in granting specific performance because even if a binding stock purchase agreement was reached between the Garners and Mr. Callaway on January 31, 2007, it violated the 2004 Shareholders' Agreement and thus was "void and ineffective." Specifically, the Callaway Estate argues that the Garners' sale of their stock was an "impermissible

21

transfer" because Mr. Callaway was not their spouse or lineal descendent, and that, as a result, the Garners were required to provide written notice to Callaway Blue and the other shareholders of the sale and give them an opportunity to exercise their option rights to purchase the shares pursuant to Section 4 of the 2004 Shareholders' Agreement. Because it is undisputed that the Garners did not provide written notice to Callaway Blue or the other shareholders regarding the stock purchase agreement reached at the January 31, 2007 meeting, the Callaway Estate argues that the agreement could not be enforced by the trial court. We disagree because there was evidence that Callaway Blue and the other shareholders had actual notice of the January 31, 2007 stock purchase agreement but never objected to the purchase as an "impermissible transfer" and never invoked their option rights, thereby waiving any challenge to the agreement based on the stock transfer provisions of the 2004 Shareholders' Agreement.

"It is well established that a party to a contract may waive a contractual provision for his or her benefit." *Forsyth County v. Waterscape Svcs., LLC*, 303 Ga. App. 623, 630 (2) (a) (694 SE2d 102) (2010). "A waiver may be express, or may be inferred from actions, conduct, or a course of dealing. Waiver of a contract right may result from a party's conduct showing his election between two inconsistent rights."

22

(Punctuation and footnote omitted.) *Ansley v. Ansley*, 307 Ga. App. 388, 393 (2) (705 SE2d 289) (2010). "[A]ll the attendant facts, taken together, must amount to an intentional relinquishment of a known right, in order that a waiver may exist." (Citation omitted.) *Forsyth County*, 303 Ga. App. at 630 (2) (a). "But if there is conflicting evidence over whether a waiver occurred, the issue is for [the trier of fact] to resolve." (Citation and punctuation omitted.) *DJ Mtg., LLC v. Synovus Bank*, __ Ga. App. __ (2) (a) (i) (b) (750 SE2d 797, 802) (2013).

As an initial matter, there was at least some evidence that the pertinent members of the Callaway family (Mr. Callaway's wife, children, and grandchildren), who comprised the Board of Directors and were the other shareholders of Callaway Blue, had actual notice of the stock purchase agreement reached between the Garners and Mr. Callaway. The "Members of the Callaway Family" received prior written notice of the January 31, 2007 meeting in a letter from the consultants Hidell and Ransome. Ken Callaway, who served as the "family representative" at Callaway Blue, then attended the January 31, 2007 meeting, where the Garners and Mr. Callaway entered into their stock purchase agreement.

There is further evidence that after the January 31, 2007 meeting, Ken Callaway informed the other members of the Callaway family about the agreement

23

that had been reached. Specifically, Ken Callaway testified that he routinely met with his three siblings to discuss his father' business dealings, including the stock purchase with the Garners, and met with his parents to discuss his father's business dealings and on February 1, 2007 to review the "letter of intent." Ken Callaway also sent a letter dated February 5, 2007 to Mr. Callaway's grandchildren informing them of the terms reached between the Garners and Mr. Callaway. Thus, there was evidence from which the trial court could find that all pertinent members of the Callaway family were made aware of the January 31, 2007 stock purchase agreement.[5]

In turn, there was evidence that despite having learned of the stock purchase agreement reached between the Garners and Mr. Callaway at the January 31, 2007 meeting, the Callaway family chose to pursue an alternative deal with the Garners outside the framework of the 2004 Shareholders' Agreement, rather than object to the agreement as an "impermissible transfer" or exercise their option rights. As previously noted, after the January 31, 2007 meeting, Ken Callaway, who had

---

[5] It is true that the notice of the stock purchase agreement received by the members of the Callaway family did not strictly comply with the notice provision of the 2004 Shareholders' Agreement. But a contractual notice provision itself can be waived by conduct of the parties. See *RHL Properties, LLC v. Neese*, 293 Ga. App. 838, 841-842 (668 SE2d 828) (2008). The conduct of the Callaway family discussed *infra* in this Division could support a finding that they waived compliance with the contractual notice provision in this case. See id.

assumed a leadership role for the Callaway family, consulted with his other family members and began putting together an alternative deal funded through trusts created for Mr. Callaway's grandchildren. Ultimately, Ken Callaway offered the Garners an alternative deal on behalf of the Callaway family to purchase their shares for $1.1 million. However, when the Garners rejected the alternative offer, the Callaway family then seized upon the immaterial inventory error in the year-end 2006 financials and canceled the stock sale altogether rather than invoke their option rights under the 2004 Shareholders' Agreement.

Moreover, there was some evidence that the Callaway family never believed that the stock purchase transaction with the Garners needed to be conducted within the framework of the 2004 Shareholders' Agreement. Ken Callaway wrote to Larry Garner, Jr. before the January 31, 2007 meeting and advised him that the "Shareholders' Agreement does not apply to the facts and circumstances" and that "Section 4 of the . . . Shareholders' Agreement . . . does not prohibit the type of transfer we have been considering since [the summer of] 2006." Moreover, the letter sent to the "Members of the Callaway Family" by Hidell and Ransome before the January 31, 2007 meeting noted that the contemplated negotiations between the Callaway Family and the Garners "cannot be considered to be within the framework

25

established by the [2004 Shareholders' Agreement]," yet none of the Callaway family objected to the letter.

Under these combined circumstances, there was evidence to support a finding that the stock transfer provisions of the 2004 Shareholders' Agreement had been waived by the Callaway family. Instead of objecting to the stock purchase agreement as an "impermissible transfer" and calling a meeting of the Board of Director and exercising Callaway Blue's option rights, or exercising their option rights as shareholders, the Callaway family pursued an alternative stock deal with the Garners outside the framework of the 2004 Shareholders' Agreement and then canceled the stock sale after the Garners refused to accept their alternative proposal. The trial court therefore committed no error in finding that a waiver had occurred and in granting the Garners' request for specific performance. See *Ansley*, 307 Ga. App. at 393 (2) (shareholders waived right to enforce buyout provision of shareholders' agreement by mutually consenting to alternative disposition of their shares).[6]

---

[6] The Callaway Estate also argues that a finding of waiver "violates the due process rights" of Callaway Blue and the other shareholders who were not before the court. But the Callaway Estate lacks standing to assert the due process rights of non-parties. See *In the Interest of B.M.*, 252 Ga. App. 716, 720 (2) (556 SE2d 883) (2001). Moreover, "[w]e will not rule on a constitutional question unless it clearly appears in the record that the trial court distinctly ruled on the point." *American Home Svcs. v. A Fast Sign Co.*, 322 Ga. App. 791, 797 (5) (747 SE2d 205) (2013). The Callaway

26

3. The Callaway Estate also contends that the trial court erred in awarding prejudgment interest under OCGA § 13-6-13 because such an award is not authorized in a specific performance case.[7] However, in *Horne v. Drachman*, 247 Ga. 802, 802, 806-807 (4) (280 SE2d 338) (1981), the trial court ordered specific performance of a stock purchase agreement and awarded the stockholder prejudgment interest from the date when the buyer breached the agreement. Our Supreme Court, citing to the predecessor version of OCGA § 13-6-13 containing the identical statutory language,[8] determined that there had been no "impermissible award of pre-judgment interest" and affirmed the trial court's award. Id. Based on *Horne*, we conclude that the trial court's award of prejudgment interest was authorized.

4. Finally, the Callaway Estate contends that the trial court erred in awarding attorney fees under OCGA § 13-6-11 based on bad faith. We agree in light of the trial court's findings regarding the stock purchase transaction.

---

Estate does not point to any ruling by the trial court on the issue of due process.

[7] OCGA § 13-6-13 provides: "In all cases where an amount ascertained would be the damages at the time of the breach, it may be increased by the addition of legal interest from that time until the recovery."

[8] See Ga. Code Ann. 20-1408.

"Conduct authorizing a fee award under OCGA § 13-6-11 must arise from the transaction underlying the cause of action being litigated, not conduct during the course of the litigation itself." (Citation and punctuation omitted.) *Fletcher v. C. W. Mathews Contracting Co.*, 322 Ga. App. 751, 755 (1) (d) (746 SE2d 230) (2013). "Mere failure to pay a just debt is insufficient to support an award of attorney fees under OCGA § 13-6-11." (Citation and punctuation omitted.) *Puckette v. John Bailey Pontiac-Buick-GMC Truck, Inc.*, 311 Ga. App. 138, 140 (2) (714 SE2d 750) (2011). Furthermore, bad faith of a third party that was not ordered by, approved of, or otherwise ratified by the defendant cannot be imputed to him or her for purposes of awarding attorney fees under OCGA § 13-6-11. See *Fletcher*, 322 Ga. App. at 756 (1) (d) (alleged bad faith of separate company in failing to pay plaintiff could not be imputed to defendant guarantor of the debt).

Here, the trial court awarded attorney fees under OCGA § 13-6-11 based on the following: "The Court finds [the] refusal to consummate the stock sale with the Garners to be in bad faith due to the deliberate undermining of Mr. Callaway's desires by his family members which put the Garners to great expense to litigate." The trial court further found that the inventory problem relied upon by members of the Callaway family in their March 28, 2007 letter to the Garners to cancel the stock sale

was not material to the stock purchase and was relied upon in bad faith, but that Mr. Callaway did not sign the letter and there "[t]here was no evidence presented at trial to suggest that [Mr.] Callaway ever intended to do anything other than to pay the Garners the $1.2 million that he agreed to pay them." The trial court further found that the "evidence in the case demonstrated that [Mr. Callaway] wanted to pay the $1.2 million even after having been advised of the inventory discrepancy." Based on these findings, the trial court awarded attorney fees to the Garners.

As established by the trial court's factual findings, it was the other members of the Callaway family, not Mr. Callaway, who acted in bad faith in the stock purchase transaction. Consequently, the trial court erred in requiring the Callaway Estate to pay the Garners' attorney fees under OCGA § 13-6-11, and its ruling in this regard must be reversed. See *Fletcher*, 322 Ga. App. at 756 (1) (d)

*Judgment affirmed in part; reversed in part. Miller, J., concurs. Ray, J. concurs in judgment only.*