[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-13723
Non-Argument Calendar
_____

D.C. Docket No. 7:18-cv-00069-HL


HESSMORGANHOUSE, LLC,

                                                        Plaintiff-Appellant,

versus


THE KINGDOM GROUP OF COMPANIES, LLC, et al.,

                                                        Defendants-Appellees.


_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

(June 24, 2020)

Before MARTIN, ROSENBAUM, and TJOFLAT, Circuit Judges.

PER CURIAM:

The Kingdom Group hired HessMorganHouse, LLC ("HMH") to provide consulting services related to the development of a group-term life-insurance plan (the "Plan").  The parties agreed that The Kingdom Group could defer payments owed for certain Pre-Rollout Services "until such time as The Kingdom Group receives compensation" from commission payments.  "Notwithstanding" that deferral agreement, the parties agreed that "no payment shall be made to HMH in excess of 20% of any commission payment."  Unfortunately for both parties, only three policies were sold before the insurer canceled the Plan for lack of participation.  The Kingdom Group received a total of $262.80 in commission payments.

HMH sued for breach of contract, seeking $113,818 plus other damages for the services performed during the Pre-Rollout phase.  HMH argues that the deferred-payment scheme functions as a condition on timing and does not relieve The Kingdom Group of its obligation to pay HMH for "Pre-Rollout Services."  The Kingdom Group, invoking the 20% clause, claims that it owes HMH only $52.56 for these services, and that such amount was already accounted for in an earlier payment.  The District Court determined that the "[n]otwithstanding" clause was a limitation, rather than a condition on timing, and granted summary judgment to The Kingdom Group.  We affirm.

2

I.

The facts—as outlined in the parties' joint stipulation below—are not in dispute.  HMH is a life insurance consulting company.  The Kingdom Group[1] retained HMH to help it develop a group-term life-insurance plan for the National Hispanic Christian Leadership Conference.  The parties entered into a series of letter agreements during this process.[2]  After the Prudential Insurance Company of America was selected as the insurer for the Plan, HMH and The Kingdom Group entered into a letter agreement dated December 24, 2013.  Pursuant to that agreement, the Kingdom Group retained HMH to provide Pre-Rollout Services and Post-Rollout Services.

Pre-Rollout Services included reviewing and negotiating the terms of the draft contract and the guarantee letter with Prudential and, if such was deemed necessary, establishing a trust.  The agreement specified that The Kingdom Group

---

[1] The Appellees are The Kingdom Group of Companies, LLC, d/b/a The Kingdom Group; Kingdom Insurance Group, LLC, d/b/a The Kingdom Group; and Nicholas J. Lewis, Individually and d/b/a The Kingdom Group.  We refer to Appellees collectively as "The Kingdom Group."

[2] HMH and The Kingdom Group entered into letter agreements on June 27, 2013; September 17, 2013; December 24, 2013; and January 7, 2014.  The parties agree that HMH performed and was fully paid for the services under the June 27, 2013 and September 17, 2013 agreements.  The January 7, 2014 letter agreement amended the payment schedule contained in the September 17, 2013 agreement.  The only dispute on appeal pertains to the December 24, 2013 agreement.

shall pay HMH an hourly rate of $300 for "Pre-Rollout Services," subject to the following payment schedule:

- The lesser of total HMH invoices or $15,000 upon receipt by The Kingdom Group of the initial commission payment from Prudential.
- The lesser of any remaining unpaid HMH invoices or $20,000 upon receipt by The Kingdom Group of the second commission payment from Prudential.
- The lesser of any remaining unpaid HMH invoices or $30,000 upon receipt by The Kingdom Group of a third commission payment from Prudential.
- Up to $30,000 on the same basis as set forth above upon receipt by the Kingdom Group of each subsequent commission payment from Prudential until such time as all outstanding HMH invoices have been paid in full.

The next provision in the agreement states that "Notwithstanding the foregoing, no payment shall be made to HMH in excess of 20% of any commission payment, taking into account amounts payable to HMH that have been deferred and remain outstanding from all letter agreements, including this one."

In addition, the parties agreed that The Kingdom Group would retain HMH for ongoing Post-Rollout Services, such as auditing retention charges and reviewing premium rates, "in consideration of our agreement to defer compensation for Pre-Rollout Services until such time as The Kingdom Group receives compensation from the product." Post-Rollout Services were to be billed at a quarterly rate of $20,000. Those fees were to be aggregated with fees for Pre-Rollout services, and "payable upon receipt by the Kingdom Group of subsequent

4

commission payments from Prudential, but collectively subject to the 20% limitation applicable to Pre-Rollout Services."

HMH performed Pre-Rollout Services and sent The Kingdom Group ten letters summarizing the hours worked each month. According to the letters, HMH's hourly charges for Pre-Rollout Services totaled $118,818. The Plan was launched in late 2015. Three insurance policies were sold under the Plan and The Kingdom Group earned $262.80 in commissions from the sales. On January 26, 2017, Prudential terminated the Plan for lack of participation.

After the insurer terminated the Plan, HMH sought to recover amounts owed for services performed during the Pre-Rollout phase. HMH filed a complaint in the Middle District of Georgia alleging that The Kingdom Group refused to pay HMH for the value of services provided and demanding damages in the amount of $113,818 (representing the amount billed for hourly services less a $5,000 payment), interest, and attorneys' fees. The parties stipulated to certain facts and cross-moved for summary judgment. The District Court granted summary judgment in favor of The Kingdom Group, holding that there was no breach of contract as the "[n]otwithstanding" clause unambiguously limits any payment to HMH to 20% of the commission payment received by The Kingdom Group. The District Court dismissed HMH's remaining claims for breach of the covenant of good faith and fair dealing, quantum meruit, account, and attorneys' fees as a

5

matter of law.  HMH appeals the District Court's grant of summary judgment on the breach of contract claim.

## II.

HMH argues that the payment deferral scheme established a condition subsequent, and that Prudential's cancellation negates The Kingdom Group's right to defer payments on the Pre-Rollout invoices.  HMH also asserts that the deferred invoice amounts are due "within a reasonable amount of time" and points to *L. Gregg Ivey, Inc., v. Land*, 252 S.E.2d 88 (Ga. Ct. App. 1979) and *Powell Co. v. McGarey Group, LLC*, 508 F. Supp. 2d 1202 (N.D. Ga. 2007) to support its argument.  On the other hand, The Kingdom Group argues that the "[n]otwithstanding" clause makes the collection of sufficient commission a condition precedent to payment and that its failure to occur excuses The Kingdom Group's obligation to pay HMH.  We uphold summary judgment in favor of The Kingdom Group as we determine that the "[n]otwithstanding" clause is an independent covenant limiting the terms of performance due.

## A.

Georgia law defines a condition subsequent as "a term of the contract within the intent of the parties that the happening or non-occurrence of an event after the contract becomes binding upon the parties, which, by pre-agreement of the parties,

6

causes the contract to terminate without further duties and obligations on any party." *Sheridan v. Crown Capital Corp.*, 554 S.E.2d 296, 300 (Ga. Ct. App. 2001). We need not decide whether the parties pre-agreed that failure of the Plan would terminate the contract as the only alleged breach is failure to pay for services that have already been performed.[3]

Therefore, we must determine whether the collection of commissions created a condition precedent for payment or whether the deferral scheme simply specified a time for payment and the effect, if any, that the "[n]otwithstanding" clause has on The Kingdom Group's obligations to pay HMH.

## B.

### 1.

"Georgia courts have long recognized a material distinction between a condition precedent and a mere accommodation between the parties over the timing of payment." *Callaway v. Garner*, 755 S.E.2d 526, 532 (Ga. Ct. App. 2014) (collecting cases), *aff'd in part, rev'd on other grounds*, 776 S.E.2d 829 (Ga. Ct. App. 2015).[4] "While the distinction may be subtle, it is crucial; if the parties'

---

[3] HMH did not sue The Kingdom Group for breaching its obligation to retain HMH to provide Post-Rollout Services. HMH's complaint alleges only that The Kingdom Group failed to pay HMH for services rendered during the Pre-Rollout phase.

[4] A contingency can be described as a condition precedent to the existence of a valid contract or as a condition precedent to performance under an existing contract. *Yi v. Li*, 721 S.E.2d 144, 148 (Ga. Ct. App. 2011). The parties do not argue that the receipt of commissions

understanding was merely to specify a time of payment based on the happening of a particular event, if the event 'does not happen,' the payor is still obligated to pay and must do so 'within a reasonable time.'" *Id.* at 533 (quoting *MacLeod v. Belvedale, Inc.*, 154 S.E.2d 756, 759 (Ga. Ct. App. 1967)).  In *MacLeod*, for example, the Georgia Court of Appeals determined that language in a loan document that $9,500 was to be repaid "upon the closing of a construction loan" specified a time of payment, not a condition of payment.  154 S.E.2d at 759. "When the existence of a debt is conditional on the happening of some event, payment cannot be enforced until the event happens; but when payment of an existing liability is postponed until the happening of an event which does not happen, payment must be made within a reasonable time." *Id.*  Because the promise to repay the loan created an absolute liability, payment was due within a reasonable time. *Id.*

*L. Gregg Ivey* provides another example of a timing provision.  There, a promissory note contained language that the note was payable at the time that thirty of the thirty-two lots in a subdivision had been sold.  252 S.E.2d at 89.  The parties disputed whether a foreclosure sale on the underlying property made this an impossible condition and thus extinguished the debt.  *Id.*  The Georgia Court of

---

was necessary to the formation of the contract, nor do they dispute that a binding contract exists. Thus, we use the term in the latter sense.

Appeals determined that the conditional language related to the timing of the repayment. *Id.* at 89–90. The promise to repay, however, was still an absolute liability. *Id.* at 90 (citing *MacLeod*, 154 S.E.2d at 759). Therefore, the impossibility of the sale did not extinguish the debt and a jury could decide a reasonable time for repayment. *Id.*

Likewise, in *Powell Co.*, the Northern District of Georgia determined that contract language stating that the Powell Company shall receive $5,000 per month, "payable on the first day of each month or upon receipt of the monthly retainer due [owners], whichever shall last occur" created an absolute liability. 508 F. Supp. 2d at 1202. The provision established a "timing for payment, rather than a condition precedent." *Id.*

HMH is correct that the "upon receipt" of commission payment language in the schedule refers to the timing for payment and is not a condition for payment. But the schedule is not the only relevant provision. Prudential's cancellation of the Plan does not absolve The Kingdom Group of its liability to pay HMH for the services performed; however, the "[n]otwithstanding" clause does limit the amount owed.

9

2.

The policy provides that "[n]otwithstanding" the preceding payment schedule, "no payment shall be made to HMH in excess of 20% of any commission payment, taking into account amounts payable to HMH that have been deferred and remain outstanding from all letter agreements, including this one."

"Notwithstanding" means "without prevention or obstruction from" or "in spite of." Webster's Third New International Dictionary (1976); *see also* Black's Law Dictionary (2019). Such qualifying language means that the parties' agreed-to deferral schedule does not alter the terms of the limitation. *See Brazeal v. Newpoint Media Grp., LLC*, 769 S.E.2d 763, 769 (2015) ("Inclusion of the phrase 'notwithstanding Section 1' . . . simply means that the right of the parties to decline to renew Brazeal's employment . . . does not alter the right of NewPoint to 'terminate' Brazeal 'with or without Cause' during the course of that term."); *Record Town, Inc. v. Sugarloaf Mills Ltd. P'ship of Ga.*, 687 S.E.2d 640, 643 (Ga. Ct. App. 2009) ("[T]he 'notwithstanding' provision in the amendment means that these requirements from the original lease do not alter the terms of the second amendment."). The limitation is clear and without conditions.

Unlike the payment deferral schedule, the "[n]otwithstanding" clause does not use timing language, such as "upon receipt." It provides that "no payment"—

10

whether made according to the payment schedule or "within a reasonable time"—shall exceed 20% of any commission payment.  This limitation applies to all amounts payable, including those that have been deferred and remain outstanding from other agreements.  The agreement itself calls this clause a limitation, when it makes the aggregation of amounts outstanding for Post-Rollout Services, "collectively subject to the 20% limitation applicable to Pre-Rollout Services." The "[n]otwithstanding" clause unambiguously places a limitation on the amounts payable to HMH.

HMH argues that the limitation is inapplicable because Prudential cancelled the Plan, thus making the collection of sufficient commissions and the provision of Post-Rollout Services impossible.  As explained above, the impossibility of an event that was specified to be the source of funds for repayment does not ordinarily excuse the underlying debt.  *See MacLeod*, 154 S.E.2d at 759; *L. Gregg Ivey*, 252 S.E.2d at 89; *see also Scott v. Hussmann Refrigeration, Inc.*, 357 S.E.2d 860, 861 (Ga. Ct. App. 1987).  A party's inability to obtain money, "whether due to his poverty, a financial panic, or failure of a third party on whom he relies for furnishing the money, will not ordinarily excuse nonperformance, in the absence of a contract provision in that regard." *Bright v. Stubbs Properties, Inc.*, 210 S.E.2d 379, 380 (Ga. Ct. App. 1974).

11

But here, there is a contract provision that relates to The Kingdom Group's performance. No payment shall exceed 20% of any commission payment. This independent covenant limits the performance due. In interpreting these as "words of covenant" rather than "words of condition,"[5] the remedy is an action for damages. *Fulton Cty. v. Collum Properties, Inc.*, 388 S.E.2d 916, 919 (1989). No action for damages lies here; however, as the parties agree that The Kingdom Group earned $262.80 in commissions from the sales and that 20% of this amount was already paid to HMH.

Thus, while the failure of the Plan and the subsequent lack of commissions does not excuse The Kingdom Group from paying HMH for its Pre-Rollout Services, the amount due under the contract is limited by the very terms the two parties agreed to. The "[n]otwithstanding" clause does not excuse performance by The Kingdom Group—it is a limitation on the performance. Payment is still due.

---

[5] The Kingdom Group points to *St. Paul Fire & Marine Insurance Co. v. Georgia Interstate Electric Co.*, 370 S.E.2d 829, 830 (Ga. Ct. App. 1988), for its characterization that the "[n]otwithstanding" clause makes the collection of sufficient commissions a condition precedent to payment. In *St. Paul Fire & Marine Insurance*, the Georgia Court of Appeals held that language that "provided that no payment shall be due Subcontractor . . . until Contractor has received payment from the Owner for said changed or extra work performed by Subcontractor" created a condition precedent for payment. There, the word "provided" indicated the parties expressly intended to make payment from a third party a condition precedent. *Id.*; *see also Collum Properties*, 388 S.E.2d at 918 ("Words such as 'on condition that,' 'if,' and 'provided,' are words of condition, and in the absence of indication to the contrary, the employment of such words in a contract creates conditions precedent."). Here, the limitation is not conditional. The notwithstanding clause does not create a condition for payment—it limits an obligation that already exists.

The amount is just limited by the terms of the contract. "That it may be unwise or disadvantageous or place a hardship" on HMH "furnishes no reason for not enforcing the contract as made." *Bright*, 210 S.E.2d at 380.

3.

Separately, HMH argues that our interpretation of the "[n]otwithstanding" clause runs afoul of the Georgia prohibition on commission payments to persons not licensed to sell insurance products. *See* O.C.G.A § 33-23-4 ("No person other than a duly licensed adjuster, agent, limited subagent, or counselor shall pay or accept any commission or other valuable consideration except as provided in subsections (b) and (c) of this Code section."). It is undisputed that HMH is not licensed to sell insurance.

Georgia case law regarding what constitutes an illegal commission under O.C.G.A § 33-23-4 is sparse. In *Seals v. Hygrade Distribution & Delivery System, Inc.*, 549 S.E.2d 412, 415 (Ga. Ct. App. 2001), the Georgia Court of Appeals determined that when Hygrade—who was not a licensed agent—charged a flat administrative fee to act as an intermediary between Seals and an insurance broker, it did not violate O.C.G.A § 33-23-4 because Hygrade "did not charge [Seals] a percentage of [Seal's] gross commissions to administer the insurance program." Here, HMH did not charge The Kingdom Group for its services based on a

13

percentage of the commissions received by The Kingdom Group. It charged $300 per hour for Pre-Rollout Services and the parties agreed to a $20,000 quarterly fee for Post-Rollout Services. Separately, the parties agreed to a limitation on the amount that HMH would be able to recover—no payment would exceed 20% of any received commission payment. We conclude that this arrangement does not violate the Georgia statute against sharing commissions because the receipt of commission payments is not a condition precedent to the payment of outstanding balances.

**AFFIRMED.**