[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 19, 2002
THOMAS K. KAHN
CLERK

No. 01-12446

D.C. Docket No. 99-01568 CV-ODE-1

AMERICAN CASUALTY COMPANY
OF READING, PENNSYLVANIA,

Plaintiff-Counter-
Defendant-Appellant,

versus

ETOWAH BANK,

Defendant - Counter-
Claimant-Appellee,

REGIONS FINANCIAL CORPORATION,

Counter-Claimant,

FEDERAL INSURANCE COMPANY,

Counter-Defendant.

Appeal from the United States District Court
for the Northern District of Georgia

**(April 19, 2002)**

Before EDMONDSON, CARNES and SILER[*], Circuit Judges.

CARNES, Circuit Judge:

This appeal involves a coverage dispute arising out of a financial institution bond issued by American Casualty Company of Reading, Pennsylvania ("CNA")[1] to Etowah Bank ("Etowah"), before Etowah was acquired by Regions Financial Corporation ("Regions").[2] A financial institution bond is a type of fidelity bond that is designed to insure financial institutions against fraudulent or unfaithful dealings by employees and certain outside parties which could damage the institution. Insofar as the law applicable to the interpretative question at the center of this case is concerned, the bond is just another insurance policy. As is often the case with insurance term coverage disputes, the pivotal issue is whether a policy term is ambiguous and therefore to be interpreted against the insurer, meaning that there is coverage, or is plain, meaning that there is no coverage.

---

[*]Honorable Eugene E. Siler, Jr., U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

[1] CNA is a registered service mark and trade name of the CNA Financial Corporation. Surety from CNA is underwritten by one of the CNA Insurance Companies, including American Casualty Company.

[2] The district court and the briefs refer to Regions Bank instead of Etowah Bank because Regions Bank, a wholly owned subsidiary of Regions Financial Corporation, is the successor in interest to Etowah by merger effective April 22, 1999.

The term in question here is "taking over," as used in a provision saying that "upon the taking over of [Etowah] by another institution," the bond and coverage under it terminates.  The meaning of this term matters because after CNA issued the bond to Etowah,  Regions purchased  100 percent of Etowah's stock.  If Regions' acquisition of all of Etowah's stock constituted a taking over of that institution, the coverage terminated before the loss was discovered in this case, and CNA is not liable. The district court concluded that the term "taking over" was ambiguous, so Regions prevailed.  We conclude that it is not, so CNA prevails.

## I.  BACKGROUND

CNA issued a financial institution bond to Etowah that insured it against losses resulting from, among other things, certain kinds of theft, forgery, fraud, or employee dishonesty.  The bond took effect on December 9, 1996 and ran through either December 9, 1998 or 1999,[3] unless terminated by one of the "conditions" listed in § 8 of the supplemental agreement to the bond, which is entitled "Termination or Cancellation." Subsection (B) of that section provides:

---

[3] The district court's order and briefs of the parties give the ending year for the bond as 1998, but the bond itself specifies the ending year as 1999.  It does not matter either way, because Regions' acquisition of Etowah and its claimed discovery of the loss occurred prior to December 9, 1998.

3

> This bond shall be terminated immediately as an entirety (1) upon the taking over of any Insured by a receiver or other liquidator or by any State or Federal official or agency, or (2) upon the taking over of any Insured by another institution, or (3) upon the exhaustion of the Aggregate Limit of Liability..., or (4) upon the expiration of the Bond Period.... (emphasis added).

The term "taking over" is not defined in the bond.

On September 10, 1998, during the period of the bond, Regions acquired Etowah by purchasing 100 percent of its outstanding stock. As a result of the transaction, Etowah became a wholly-owned subsidiary of Regions. After the acquisition, Etowah continued to operate under the same bylaws, continued making loans and accepting deposits just as it had before, did not divest itself of significant assets or acquire significant new liabilities, and maintained separate books and records from Regions. Etowah's Board of Directors remained the same, at least through the period relevant to this case, except that a new President was named and acquired a seat on the board, while the former President and Chairman of the Board stayed on only as Chairman.

On November 17, 1998, Regions notified CNA of its claim under the bond for indemnity from a loss that it contends was discovered on October 30, 1998, less than two months after acquiring Etowah and during the bond period. The details of the loss are not really important for our purposes. Suffice it to say that the loss was of the kind that the bond was arguably intended to cover, if the bond was in effect,

4

and the loss was well in excess of the $2 million limit of the bond.

After Regions submitted its claim, CNA initiated this lawsuit, seeking a declaration that it was not liable for a number of reasons, one of which is that the bond had terminated upon Regions' acquisition of Etowah. Regions counterclaimed against CNA for breach of contract, seeking a declaration that its loss was covered up to the policy limits of the bond.[4]

CNA and Regions each moved for summary judgment. The district court denied CNA's motion and granted Regions' motion, and it entered judgment against CNA for $2 million. The court believed that the "taking over" language in the bond is ambiguous, and for that reason has to be interpreted, if it reasonably can be, against CNA as the insurer and in favor of Regions as the insured.[5]

---

[4] Regions also named Federal Insurance Company ("Federal") as a defendant, because when Etowah merged with Regions, it obtained coverage from Federal under a financial institution bond issued by Federal to Regions. After Regions settled with Federal, it was dismissed from the case.

[5] The court also determined that no genuine fact issues existed with regard to whether a loss resulting from an event covered by the bond occurred, whether the event was "discovered" during the bond term, and whether proof of loss with full particulars was provided to CNA. CNA contends the court erred in each of those determinations, but as it turns out we need not address those contentions.

## II. DISCUSSION

This is a diversity action to which Georgia substantive law applies, and that law is not in dispute. Under Georgia law, parties to an insurance bond are bound by its plain and unambiguous terms. See Richards v. Hanover Ins. Co., 299 S.E. 2d 561, 563 (Ga. 1983). However, if a term is ambiguous it must be construed against the insurer, as the drafter, and in favor of the insured. See Georgia Baptist Children's Homes & Fam. Ministries v. Essex Ins. Co., 427 S.E.2d 798, 801 (Ga. Ct. App. 1993); Georgia Farm Bureau Mut. Ins. Co. v. Huncke, 524 S.E.2d 302, 303 (Ga. Ct. App. 1999). Words of an insurance contract must be given their usual, ordinary, and common meaning. See Bold Corp. v. Nat'l Union Fire Ins. Co., 454 S.E.2d 582, 584 (Ga. Ct. App. 1995). A term is ambiguous if it is susceptible to more than one reasonable interpretation. See Hurst v. Grange Mut. Cas. Co., 470 S.E.2d 659, 663 (Ga. 1996). Contract interpretation is a question of law and is subject to de novo review. See Gibbs v. Air Canada, 810 F.2d 1529, 1532 (11th Cir. 1987).

The question is whether Regions' acquisition of 100 percent of Etowah's stock terminated the bond, because it was "the taking over of [Etowah] by another institution" within the meaning of § 8(B)(2) of the supplemental agreement relating to the bond. We think that the term "taking over" is not ambiguous, and our

6

understanding of its plain meaning is confirmed by general, legal, and business dictionaries. The Random House Dictionary (2d ed. 1987) defines "takeover" as an "acquisition or gaining control of a company through the purchase or exchange of stock." Black's Law Dictionary (7th ed. 1999) defines it as "[t]he acquisition of ownership or control of a corporation." The Dictionary of Business (3rd ed. 2001) defines a "takeover" as "buying a controlling interest in a business by buying more than 50% of its shares." See also Longman Business English Dictionary 484 (2000) ("[T]o take control of a company by buying more than 50% of its shares."). That is what Regions did. It acquired more than fifty percent of the stock of Etowah, thereby "taking over" Etowah.

The district court thought not. It saw an ambiguity – not so much in the term itself as in the context in which that term was used, the surrounding subsections. In the court's view, § 8 of the supplemental agreement dealt generally with regulatory-type takeovers, leading to the conclusion that § 8(B)(2) referred only to takeovers of one private failing institution (the insured) by another at the behest of a state or federal regulatory agency. Or at least there was enough ambiguity to make that a reasonable interpretation. We disagree. Section 8(B) has four subparts, each describing a different contingency which will cause the bond to terminate. One of them, the first one, explicitly refers to and plainly encompasses

7

the taking over of a failing institution by a liquidator or governmental official or agency. The last two clearly are not limited to failing institutions, because the third one is the exhaustion of the aggregate limit of liability, and the fourth one is the expiration of the bond period. So, there is no contextual reason to conclude that the contingency at issue, the second one, is restricted to cases involving failing institutions. And nothing in the language of the second contingency – "upon the taking over of any Insured by another institution" – indicates that either. Financial institution takeovers occur just as frequently, or more so, when the institutions taken over are doing just fine financially as when they are failing.

Regions' argument that "taking over" as used in the bond does not mean what it ordinarily does, or that there is at least an ambiguity about it, relies upon the doctrine set forth in the "core function" decisions of the Fifth Circuit. Those decisions say that in order to determine whether a transaction has resulted in a "takeover," courts should examine whether the transaction caused a change in who has control over the performance of the "core functions" of the insured entity and the extent to which that control is exercised to affect the "core functions" of the entity, including, for example, looking to the extent of change in management of the bank. See United States Fire Ins. Co. v. Fed. Dep. Ins. Co., 981 F.2d 850, 851-52 (5th Cir. 1993) (to determine if "takeover" occurred so that the bond terminated

8

under the automatic termination provision dealing with regulatory takeovers, a court should look to actual authority and control exercised by the conservator after taking supervisory control over the insured bank); Sharp v. Fed. Sav. and Loan Ins. Corp., 858 F.2d 1042, 1045-46 (5th Cir. 1988) (essence of whether "takeover" has occurred under automatic termination provision dealing with regulatory takeovers is whether the bank management which purchased the bond is no longer in control of the bank's core functions); First Nat'l Life Ins. Co. v. Fidelity & Deposit Co. of Md., 525 F.2d 966, 969 (5th Cir. 1976) (stating in dicta in a case involving promoters taking control of parent company that automatic termination provision dealing with takeovers "'by another concern' makes liability for the risks assumed by the bond depend upon a continuity of the same general management" that controlled the "taken over" company when the bond was procured).

The "core functions" test arose and has been applied in the context of takeovers by a liquidator, receiver, conservator, or federal or state official or agency of a failing institution, and the test seems to have been developed for the purpose of determining what other than acquisition of a controlling amount of the stock of an insured institution constitutes a takeover. An insured institution can be effectively taken over by exercise of regulatory authority even though stock ownership does not change, and the "core functions" test enables a court to

9

determine whether in fact that kind of takeover has occurred by looking to changes in who is in control of the core functions of the insured.[6] By contrast, when an institution acquires a controlling amount of the stock of another, it obtains control of the other regardless of whether, how, or through whom it decides to exercise that control.

Regions points to § 5 of the supplemental agreement to the bond, which is a "change in control" provision, and argues that if we do not interpret "taking over" in line with the "core functions" test, we will render § 5 functionless and we ought not do that. We certainly accept the proposition that a contract ought to be interpreted so that every section of it has a function. See O.C.G.A. § 13-2-2(4) (a construction which upholds the contract, both in total, and in every part, should be preferred to one that does not); Board of Regents v. A.B. & E, Inc., 357 S.E.2d 100, 103 (Ga. Ct. App. 1987). We disagree, however, that giving the term "taking over" in § 8(B)(2) its plain meaning renders § 5 superfluous. Section 5 is as follows:

> If at any time the Insured shall obtain knowledge of a transfer of its outstanding voting stock which results in a change in Control of the Insured, the Insured shall as soon as practicable after obtaining such knowledge give written notice to the Company.... As used in this...Agreement..., "Control"

---

[6] All of the cited Fifth Circuit "core functions" decisions arose from regulatory takeovers that did not involve stock acquisition.

10

means the power to determine the management or policy of the Insured by virtue of voting stock ownership.  A change in ownership of voting stock which results in direct or indirect ownership by a stockholder or an affiliated group of stockholders of ten percent (10%) or more of the outstanding voting stock of the Insured shall be presumed to result in a change in Control for the purpose of giving the Company the required notice.  Failure to give the required notice shall result in termination of coverage of this bond....

The purpose of this section is to ensure that CNA receives notice of any change in "control," as that term is defined in the section.  It is a notice provision, not a termination provision. There is nothing in that section to suggest that "control" as defined in it is synonymous with "taking over" as that term is used in § 8(B)(2).

A change in control for § 5 notice purposes occurs when ten percent of the insured's stock is acquired, while a taking over for § 8(B)(2) termination purposes usually occurs when more than fifty percent of the stock is acquired.[7]  While every "taking over" which terminates the bond will involve a change in control, not every change in control which requires that notice be given will involve a takeover. The two provisions serve different purposes and have different, albeit sometimes overlapping,  fields of operation.  It follows that both  provisions can be applied

---

[7]Of course, depending upon the number of shareholders and how stock is dispersed among them, de facto or effective takeovers can occur when less than fifty percent of the shares are acquired. But with most corporations, an acquisition of more than ten percent of the shares is required for a takeover, which gives significance to the difference between the ten percent measuring rod of § 5 and the "takeover" standard of § 8(B)(2).

11

without rendering either meaningless. See First Am. Nat'l Bank v. Fidelity & Deposit Co. of Maryland, 5 F.3d 982, 985 (6th Cir. 1993) ("Both [the takeover and change in control] provisions can be applied without rendering either section meaningless because the sections are distinguishable in purpose and applicability.").

## III. CONCLUSION

Because Regions' acquisition of 100 percent of the stock of Etowah constituted a "taking over" of it for purposes of the termination provision of the financial institution bond CNA issued to Etowah, CNA was not liable for any losses Regions discovered after that acquisition.

The judgment in favor of Regions is REVERSED, and the case is REMANDED with instructions that judgment be entered in favor of CNA.