[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No.  13-14000

_____

D.C. Docket No. 0:12-cv-61521-WPD

STONEGATE BANK,
a Florida banking corporation,

Plaintiff–Appellant,

versus

TD BANK, N.A.,

Defendant–Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(January 6, 2015)

Before ED CARNES, Chief Judge, and RESTANI,[*] Judge, and ROBRENO,[**]
District Judge.

_____

[*] Honorable Jane A. Restani, United States Court of International Trade Judge, sitting by
designation.

ROBRENO, District Judge:

This appeal arises out of a dispute over the meaning of certain provisions within a multi-bank loan Participation Agreement ("Agreement").  Plaintiff–Appellant Stonegate Bank ("Stonegate") owned a 10.7142% participating interest in a construction loan that defaulted in 2011.  Defendant–Appellee TD Bank, N.A. ("TD Bank") owned a 28.5714% interest and was also the lead bank in the deal. Upon default, participating banks representing 86.61% of the loan interest voted to sell the loan back to the borrower at a substantial discount.  In spite of this supermajority in favor of the sale, Stonegate voted in the minority against it. Stonegate subsequently brought this diversity suit against TD Bank, claiming breach of contract and willful misconduct under the Agreement.  In reviewing these claims, the district court found that, although the Agreement provisions at issue were ambiguous, that ambiguity could be resolved by applying Georgia's statutory rules of contract construction.  The district court granted summary judgment in favor of TD Bank and Stonegate appealed.

I.

A.

On March 26, 2008, Integrity Bank (Stonegate's predecessor-in-interest) and

---

[**] Honorable Eduardo C. Robreno, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

Fairfield Financial Services, Inc. (TD Bank's predecessor-in-interest) entered into the Participation Agreement. Under it, Fairfield, as originating/lead bank, sold to Integrity an undivided, participating 10.7142% interest in a $26,925,557.21 construction loan made to Chaven Investments, LLC ("Chaven"). Chaven borrowed this sum in order to finance the purchase of the Palm Cove Marina in Jacksonville, Florida. In time, and via its predecessor-in-interest, TD Bank acquired a 28.5714% interest in the loan and assumed the mantle of lead bank. At the time of the events relevant to this appeal, a total of thirteen banks owned participation interests in the loan, each bank having executed a separate participation agreement that differed from the others only with respect to the percentage of its participating interest.

On September 12, 2011, after twice receiving extensions on the loan's maturity date, Chaven defaulted. On October 27, 2011, all of the participating banks authorized TD Bank to negotiate a loan sale with Chaven. These negotiations culminated on December 6, 2011, when Chaven sent TD Bank a "best and final" offer to purchase the loan for $9 million. By December 15, 2011, banks representing 86.61% of the loan's total participating interests had voted to approve the sale. However, Stonegate and one other bank voted against it. TD Bank proceeded over these objections and the sale was finalized on December 21, 2011.

3

On December 29, 2011, TD Bank wired Stonegate $962,659.39, or that portion of the sale proceeds relating to Stonegate's participating interest. Stonegate accepted the payment, which was not conditioned on any acknowledgements or relinquishments of any rights by Stonegate.

Stonegate subsequently brought this diversity suit under Georgia law, claiming breach of contract and willful misconduct by TD Bank under the Agreement. After finding the Agreement plainly ambiguous, the district court applied Georgia's "specific over general" rule of contract interpretation and ruled in TD Bank's favor. Stonegate then appealed to this Court.

B.

Following are sections from the parties' Agreement relevant to this appeal:

8. Obligations of Originating Bank.

Originating Bank shall, until Participating Bank's Participation Interest in the Loan has been repaid in full: (i) hold the original promissory notes and, to the extent actually received by Originating Bank, all other documents evidencing or providing security for the Loan or containing agreements in respect to the sale or repayment of the Loan (hereinafter referred to collectively as the "Loan Documents") for the benefit of itself and Participating Bank . . . .

. . . .

16. Administration of Loan.

(a)

Originating Bank shall, until all amounts payable with respect to Participating Bank's Participation Interest have been paid in full: (i) hold the Note(s) and all other documents evidencing the Loan,

4

guaranteeing or providing security for the Loan or containing agreements with respect to the sale or repayment of the Loan (collectively, the "Loan Documents") for the benefit of Participating Bank and Originating Bank . . . .

(b)

Without the prior written consent of the holders of 75% or more of the outstanding interest in the Loan, Originating Bank shall not: (i) make or consent to any modification, amendment, or termination of any of the material terms or conditions of the Loan Documents (without limiting the foregoing, a "material" term includes the interest rate, the specific collateral pledged, guaranties made, scheduled term and maturity date, required covenants, and like provisions), (ii) make or consent to any release of any guarantor or release modification, substitution or exchange of any of the Collateral given as security for the Loan, (iii) accelerate the maturity date of the Loan; make or consent to any extension or renewal of the Loan; or (iv) commence any foreclosure or other legal action or proceeding for the collection of the Loan.

. . . .

(e)

Upon becoming actually aware of a default by Borrower(s) under any of the Loan Documents or with respect to the Collateral, or any event which, with the giving of notice or passage of time or both, would constitute a default thereunder, Originating Bank immediately shall notify Participating Bank of such default or event, and Originating Bank and Participating Bank shall thereafter attempt to mutually agree upon a course of action within sixty (60) business days. If, within sixty (60) business days a mutually agreeable course of action can not be decided by the holders of 50% or more of the outstanding interest in the Loan, Originating Bank shall (i) accelerate the maturity of the Loan, (ii) demand payment of the loan, and (iii) take appropriate action to collect the Loan.

. . . .

18. Amendment and Modification.

5

No amendment, change [sic] modification or termination of this Agreement shall be valid or binding upon the parties hereto unless such amendment, change, modification or termination shall be in writing and signed by both parties.

Participation Agmt. ¶¶ 8, 16, 18.

## II.

We review[1] the district court's summary judgment decision de novo, applying the same legal standards as below, which includes "constru[ing] the facts and draw[ing] all reasonable inferences in favor of the non-moving party." Bradley v. Franklin Collection Serv., Inc., 739 F.3d 606, 608 (11th Cir. 2014). "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." Strickland v. Norfolk S. Ry. Co., 692 F.3d 1151, 1154 (11th Cir. 2012). A court must not engage in "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences" when deciding a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). We may, however, "affirm the district court's judgment 'on any ground that finds support in the record.'" Strickland, 692 F.3d at 1154 (quoting Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1256 (11th Cir. 2001)).

## III.

---

[1] The district court had diversity jurisdiction under 28 U.S.C. § 1332. We have jurisdiction to review the district court's grant of summary judgment under 28 U.S.C. § 1291.

6

Stonegate claims the district court erred in three successive ways: (1) it incorrectly held the Agreement to be ambiguous; (2) even if the Agreement were ambiguous, the court failed to properly apply Georgia's rules of contract construction; and (3) even if the court did apply the rules correctly, it failed to consider parol evidence and draw all reasonable inferences in favor of Stonegate. Based on our analysis below, we need only reach the first two arguments.

A.

Under Georgia law,[2]

> [t]he construction of contracts involves three steps. At least initially, construction is a matter of law for the court. First, the trial court must decide whether the language is clear and unambiguous. If it is, the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning. Next, if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity. Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury.

City of Baldwin v. Woodard & Curran, Inc., 743 S.E.2d 381, 389 (Ga. 2013) (alteration in original) (quoting Record Town, Inc. v. Sugarloaf Mills Ltd. P'ship of Ga., 687 S.E.2d 640, 642 (Ga. Ct. App. 2009)). "The existence or nonexistence of an ambiguity is a question of law for the court. If the court determines that an ambiguity exists, however, a jury question does not automatically arise, but rather

---

[2] Stonegate and TD Bank, as successor parties to the Agreement, agreed that "the laws of the State of Georgia shall govern the interpretation, validity and enforceability hereof, without regard to the conflicts of law rules thereof." Participation Agmt. ¶ 20.

the court must first attempt to resolve the ambiguity . . . ." Simpson v. Infinity Select Ins. Co., 605 S.E.2d 39, 42 (Ga. Ct. App. 2004) (citation omitted).

Language is ambiguous if it admits more than one reasonable interpretation. See Hammer Corp. v. Wade, 628 S.E.2d 638, 641 (Ga. Ct. App. 2006) ("[L]anguage is unambiguous if it is capable of only one reasonable interpretation." (alteration in original) (quoting Caswell v. Anderson, 527 S.E.2d 582, 584 (Ga. Ct. App. 2000))); St. Charles Foods, Inc. v. Am.'s Favorite Chicken Co., 198 F.3d 815, 820 (11th Cir. 1999) ("A contract term is ambiguous if it is reasonably susceptible of more than one interpretation." (quoting Int'l Bhd. of Boilermakers v. Local Lodge D111, 858 F.2d 1559, 1561 (11th Cir. 1988))).

## B.

When analyzing a disputed contract under the first step of Georgia's contract construction inquiry, if "the words in th[e] contract are plain and obvious, they must be given their literal meaning, and unambiguous terms are taken in their plain, ordinary and popular sense as supplied by dictionaries." Record Town, Inc., 687 S.E.2d at 643 (citation omitted); see also Perkins v. M & M Office Holdings, LLC, 695 S.E.2d 82, 84–85 (Ga. Ct. App. 2010) (using dictionary definitions to analyze terms under the first step of the contract construction inquiry).

The district court found plain ambiguity among the interactions of Sections 16(b), 16(e), and 18. Order, Aug. 5, 2013, at 8. In doing so, it sketched the

8

parties' competing interpretations, providing a framework we find helpful for analyzing the key differences between them.  Describing Stonegate's general position, the district court wrote that

> there is a reasonable interpretation that these provisions create a sliding scale of permissible actions based on escalating thresholds for approval by the Participating Banks/Participation Interests.  Under that interpretation, 50% of the Participation Interests can agree to—but not necessarily implement—certain courses of action if the Loan is in default.  75% of the Participation Interests can then implement those courses of action or can otherwise act regardless of whether the Loan is in default.  If, however, any action would modify or terminate terms of the Participation Agreement(s), each Participating Bank—and 100% of the Participation Interests—must approve that action in writing.

Id.  The district court next described the opposing position, which it associated with TD Bank:

> On the other hand, it is reasonable to interpret Section 16(b) as authorizing broad conduct, including a full sale of the Loan, regardless of how that sale would affect the Participation Agreement(s).  It is similarly reasonable to interpret Section 16(e) as providing broader authority to act—with approval by only 50% of the Participation Interests—only if the Loan is in default.  Finally, it is reasonable to interpret Section 18 as a general clause that does not apply to the specific courses of action covered by Sections 16(b) and 16(e).  Rather, Section 18 would apply to changes to the overarching Participation Agreement, such as, for example, modifying the voting threshold in Section 16(e) from 50% to 60% or changing the governing law in Section 20 to Alabama law.

Id.[3]

---

[3] The district court held that, since it had resolved the Agreement's ambiguity by considering Sections 16(b) and 18, it did not need to reach the parties' Section 16(e) arguments.  Id. at 11 n.3.  We note that, as the parties agree, the participating banks voted to approve the sale

At the heart of Stonegate's argument is its conception of its participation interest as an "indefeasible, undivided, titled ownership in the Loan"—akin to an inviolable property right.  Stonegate's Br. 17.  Stonegate asserts that, in the event of default, Section 16(e) allows a majority of the participating interests to agree on a plan of action and, "[i]f a plan is made, necessary votes to approve it must occur under Sections 16(b) or 18, depending on the action."  Id. at 20.  According to Stonegate, Section 16(b) allows 75% of the participating interests to modify certain aspects of the loan documents (but not the "underlying indebtedness"), while Section 18 requires the consent of 100% of those interests in order to modify or terminate the Agreement (i.e., to sell the underlying loan).  Id. at 17–18.

More specifically, Stonegate disputes that the term "Loan Documents" in Section 16(b) may be defined by referencing Sections 8 or 16(a).  It argues that the definition of "Loan Documents" provided in Sections 8 and 16(a) must be cabined to those sections, since the purpose of those sections—"the fiduciary obligations of the lead bank to protect documents"—is different from the purpose of Section 16(b)—"to provide a voting mechanism for making changes to material terms of Loan Documents, or to authorize foreclosure."  Id. at  26–27.  Moreover, Stonegate disputes that Section 16(b)'s "material terms or conditions of the Loan

---

under Section 16(b).  Because this matter can be resolved without reference to 16(e), we will not consider that section in detail.  See also infra note 9.

10

Documents" refers to the loan principal itself. Stonegate first distinguishes between "the obligation [i.e., the indebtedness itself] and the Documents evidencing it." Id. at 30. Then, from the examples Section 16(b) provides ("without limiting the foregoing, a 'material' term includes the interest rate, the specific collateral pledged, guaranties made, scheduled term and maturity date, required covenants, and like provisions"), it argues that these are all concerned with "how the Loan is collateralized, secured and administered," not with the "obligation to repay the principal" or with the underlying indebtedness itself. Id. at 31 (emphasis omitted). Further, the "obligation to repay the principal of the Loan is not a 'like provision' in this context." Id. Stonegate maintains that its interpretation is clear and the district court was wrong to hold the Agreement ambiguous.

TD Bank sees no ambiguity in the Agreement. It reads the following excerpt from Section 16(b) as expressly authorizing a sale of the loan: "termination of any of the material terms or conditions of the Loan Documents." TD Bank's Br. 16. TD Bank argues that Stonegate's cabining of the definition of "Loan Documents" to Sections 8 and 16(a) would unjustifiably give "Loan Documents" two different meanings within Section 16 alone. Id. at 19. Finally, TD Bank asserts that, unambiguously, the "total amount due under the Loan is a material term." Id. Because the note, which establishes the amount due, is included in

11

Section 8's and Section 16(a)'s definitions of "Loan Documents,"[4] as are "agreements with respect to the sale or repayment of the Loan," "Loan Documents" includes the loan's principal. Id. at 19–20.

We agree with the district court that the Agreement is plainly ambiguous on the issue of selling the loan. The plain, ordinary meanings of "Loan," "Loan Documents," and "material terms or conditions" do not provide much help, particularly as the latter two terms are not generally used outside of very context-specific settings. Rather, the context surrounding the Agreement's use of these terms indicates that their meanings are technical and industry-specific. See Estate of Pitts v. City of Atlanta, 746 S.E.2d 698, 704 (Ga. Ct. App. 2013) ("Words are to be understood in their ordinary, everyday meanings—unless the context indicates that they bear a technical sense." (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 69 (2012))). The parties have not provided any useful external evidence that would help us to determine these terms' industry meanings. See id. at 705 (declining to analyze a contested term's industry

---

[4] TD Bank's reading of the "Loan Documents" definition does not fully capture the Agreement's haziness here. Section 8 reads, in relevant part: "[H]old the original promissory notes and, to the extent actually received by Originating Bank, all other documents evidencing or providing security for the Loan or containing agreements in respect to the sale or repayment of the Loan (hereinafter referred to collectively as the 'Loan Documents')." It is unclear whether "collectively" includes "original promissory notes" or simply "all other documents." Section 16(a) reads: "[H]old the Note(s) and all other documents evidencing the Loan, guaranteeing or providing security for the Loan or containing agreements with respect to the sale or repayment of the Loan (collectively, the 'Loan Documents')." It is likewise unclear whether "collectively" includes the "Note(s)" or simply "all other documents evidencing the Loan," etc.

12

meaning when the parties "neither argued in their appellate briefs nor pointed to any parol evidence" of such meaning).[5]

More generally, each party's overarching interpretation of the Agreement is reasonable, but nothing in the Agreement clearly steers the interpreter in one direction or the other. In addition, neither interpretation is without flaw. For example, Stonegate makes too much of the Agreement's distinction between "Loan" and "Loan Documents." In plain terms, the loan is a conceptual debt agreement, while the loan documents simply evidence that agreement. Stonegate tries to elicit larger limiting principles from Section 16(b)'s ad hoc listing of loan document examples (i.e., how the loan is "collateralized, secured and administered"). But the Agreement itself does not exclude other types of documents—notably, those evidencing the sale or repayment of the loan. Stonegate has another problem in that it shows no support for its view that Section 18 somehow covers primarily "the right to alter the obligations, liabilities and indebtedness, i.e. the Loan itself, evidenced and secured by the Loan Documents."

---

[5] Stonegate does reference Generally Accepted Accounting Principles ("GAAP") in support of its claim that the Loan principle was intentionally omitted from Section 16(b)'s list of Loan Documents. Stonegate's Reply Br. 7. "[I]f Fairfield could sell the Loan or reduce the principal without a participant's consent, its sales of participation interests in the Loan may not have qualified as 'sales' under GAAP"—"potentially impacting its ability to service other loans as a result of regulatory lending limits." Id. This argument does not so much clarify the industry's use of the word as it asks us to rely on a roundabout chain of assumptions. For example, Stonegate has not shown that the abstruse GAAP requirements typically inform the language banks insert in their agreements. Nor has it shown that banks generally allow accounting policy to dictate front office decisions—that the proverbial tail wags the dog, so to speak. Stonegate's use of GAAP does not aid us here.

Stonegate's Br. 16.  We find nothing in the Agreement that links Section 18's language ("No amendment, change [sic] modification or termination of this Agreement shall be valid or binding upon the parties hereto unless [it is] in writing and signed by both parties.") to the underlying indebtedness of the loan—the conceptual core of the Agreement.  Section 18 is not clear: it could refer to modifications of the underlying loan, to those of the Agreement terms, or to those of both.  Stonegate's interpretation is by no means airtight.

But neither is TD Bank's.  For example, as discussed in footnote 4 above, TD Bank elides the definitional uncertainties in Sections 8 and 16(a).  Additionally, it parses Sections 16(b)'s language closely, but does not give a reason beyond mere common usage for why the loan's principal is a "material term."

In sum, the district court was correct that the Agreement is plainly ambiguous on the question of how a loan sale must be authorized under the Agreement.  We affirm its holding to that effect and proceed to apply Georgia's rules of contract construction.

## C.

Georgia courts do not take a uniform approach in applying their state's rules of contract construction.  Instead, they tend to make use of different rules on an ad hoc basis.  See, e.g., DJ Mortg., LLC v. Synovus Bank, 750 S.E.2d 797, 804–05

14

(Ga. Ct. App. 2013); <u>Estate of Pitts</u>, 746 S.E.2d at 704–08; <u>see also, e.g.</u>, <u>Sun Am.</u>

<u>Bank v. Fairfield Fin. Servs., Inc.</u>, 690 F. Supp. 2d 1342, 1361–62 (M.D. Ga.

2010).  Only a few guiding principles exist.  For example, "[t]he cardinal rule of

construction is to ascertain the intention of the parties." Ga. Code Ann. § 13-2-3.

Another is that "[n]o canon of interpretation is absolute.  Each may be overcome

by the strength of differing principles that point in other directions." <u>DJ Mortg.,</u>

<u>LLC.</u>, 750 S.E.2d at 805 (quoting <u>Estate of Pitts</u>, 746 S.E.2d at 702 (quoting Scalia

& Garner, <u>supra</u>, at 59)).  Georgia's rules of interpretation derive from statute, <u>see</u>

Ga. Code Ann. § 13-2-2, and case law.

After finding the Agreement's terms ambiguous, the district court appealed

primarily to the following rule of construction, found in the case law: "[T]he Court

'should avoid any construction that renders portions of the contract language

meaningless, and when a provision specifically addresses the issue in question, it

prevails over any conflicting general language.'"  Order, Aug. 5, 2013, at 9

(quoting <u>Greenwald v. Odom</u>, 723 S.E.2d 305, 317 (Ga. Ct. App. 2012)).  In doing

so, the district court found the "issue in question" to be "a particular course of

conduct with respect to the ownership and value of the Loan." <u>Id.</u>  Because

Section 16(b) allows "modification, amendment, or termination of any of the

15

material terms or conditions of the Loan Documents,"[6] it specifically addresses the issue in question. Id. Section 18, by contrast, only generally addresses changes to the Agreement. In addition, the district court viewed Section 16(b) as more specifically recognizing and engaging with the nature of the larger, multiparty participation arrangement. It read Section 16(b) as "specifically referenc[ing] the Loan, the Loan Documents, the Originating Bank, and material terms," and providing instructions on how the several participating banks would coordinate their efforts (i.e., via the 75% vote). Id. at 9–10. Section 18, which "just generally requires a signed writing by both parties," is not directed toward the multiparty arrangement. Id. at 10 (internal quotation marks omitted). Instead, the district court read Section 18 as covering changes such as those to the operative law or to the voting thresholds, which require full consent from each party. Therefore, it found that Section 18's more general provisions do not override Section 16(b)'s more specific terms. This, in the district court's view, resolved the ambiguity and ended its inquiry.

Stonegate argues that the district court improperly neglected three of Georgia's rules of construction: (1) "[w]ords generally bear their usual and common signification," Ga. Code Ann. § 13-2-2(2); (2) "[t]he construction which will uphold a contract in whole and in every part is to be preferred," § 13-2-2(4);

---

[6] The district court found that "the total amount due under the Loan is a material term of the Loan Documents." Id.

16

and (3) "[i]f the construction is doubtful, that which goes most strongly against the party executing the instrument or undertaking the obligation is generally to be preferred," § 13-2-2(5). Stonegate's Br. 35–36. We cover these and other pertinent rules below.

1.

First we examine the rule that words generally bear their usual and common signification. Stonegate provides the uncontroversial dictionary definitions for several Agreement terms, including "undivided," "interest," "title," "hold," and "repay." Id. at 36–37. More substantively, it challenges the district court's reading of Section 16(b) as "speak[ing] to making material changes to the entire business arrangement underlying this dispute." Id. at 37. Because Section 16(b) directly references only "modifying, amending or terminating material terms or conditions of the Loan Documents," it does not engage with the underlying business arrangement. Id. at 38 (internal quotation marks omitted). With help from the dictionary, Stonegate interprets "terms" and "conditions" from Section 16(b) as the Agreement's "rules of the road," which do not encompass "the authority to terminate the Loan or the obligation to repay it." Id. We note that Stonegate's arguments here, and this rule of construction generally, add little to the discussion of plain ambiguity above.

17

A corollary principle, however, points us in the direction of TD Bank's interpretation. Georgia case law has developed the rule that words used in one sense in one part of a contract are generally considered to have been used in the same sense in other parts of the contract. See Estate of Pitts, 746 S.E.2d at 702 ("Without some indication to the contrary, general words . . . are to be accorded their full and fair scope. They are not to be arbitrarily limited." (quoting Scalia & Garner, supra, at 101)). Under this rule, we read the definition of "Loan Documents," as defined in Section 8 and 16(a), to apply to the whole Agreement—notwithstanding Stonegate's attempts to differentiate these sections from Section 16(b) based on their respective purposes. With this in mind, we advance to the next rule.

2.

In Georgia, the construction which will uphold a contract in whole and in every part is to be preferred. Stonegate understands this rule to mean that "under Georgia law, a contract ought to be interpreted so that every section of it has a function." Stonegate's Br. 39 (citing Am. Cas. Co. of Reading, Pa. v. Etowah Bank, 288 F.3d 1282, 1287 (11th Cir. 2002)). "Therefore, under the applicable rules of contract construction, the Georgia courts 'should avoid any construction that renders portions of the contract language meaningless.'" Id. (quoting Deep Six, Inc. v. Abernathy, 538 S.E.2d 886, 888 (Ga. Ct. App. 2000)). Stonegate

18

claims that the district court's interpretation failed to look at the Agreement as a whole, thereby ignoring the Agreement's purpose and rendering several provisions meaningless. Specifically, Stonegate examines the interaction between Sections 16(b) and 18. It asserts that the overarching purpose of the Agreement is to "provide a construct for collective participation in the same loan." Id. at 42. Because an identical participation agreement was executed by each of the participating banks, the very purpose of the Agreement was to "account[] for the fact that there are multiple participation agreements addressing the same loan." Id. at 43 (quoting Order, Aug. 5, 2013, at 10). Section 18, which specifically deals with changes to the Agreement, is therefore the provision that properly deals with collective aspects of the arrangement—especially a sale of the loan.

Stonegate goes on to contest the district court's finding that Section 18 addresses only changes to "aspects of the distinct participation agreement between [Stonegate] and [TD Bank]." Id. at 44 (quoting Order, Aug. 5, 2013, at 10). Specifically, Stonegate attacks the district court's suggestion that Section 18 covers things like changes to the voting requirements and governing law. Stonegate argues that both examples are unworkable because allowing one participating bank to deviate from the terms common to all the other banks would create havoc. Thus, Stonegate argues, the district court's interpretation of Section 18 has rendered it meaningless.

19

We note that Stonegate's argument directly conflicts with the district court's opinion that Section 16(b) deals more specifically with changes affecting all of the participating banks. The central question is therefore which provision—Section 16(b) or 18—is the prism through which the Agreement should be viewed. In answering this question, we must also ensure that the less central provision is not thereby rendered meaningless. In other words, this rule of construction requires that each provision play a meaningful part in the whole of the working Agreement. And each party's interpretation abides by this requirement, at least ostensibly. Stonegate would have Section 18 take precedence, overriding Section 16(b) to the extent the issue involves changes to the underlying indebtedness. TD Bank (and the district court) would have Section 16(b) take precedence for all of the loan's material terms or conditions—including changes to the underlying indebtedness— leaving Section 18 to cover all other changes to the Agreement. Neither interpretation renders meaningless the less central provision. Furthermore, Stonegate's argument that TD Bank's (and the district court's) conception of Section 18 is unworkable does not hold up to scrutiny. Stonegate neglects to consider that all changes to the agreements would be made across the board.[7]

---

[7] TD Bank recognizes this, where it notes that Section 18 forbids Stonegate from seeking to amend the voting percentages "absent a signed writing by all Participating Banks." TD Bank's Br. 26. TD Bank goes on: "Stonegate seeks to alter Section 16(b)'s voting threshold from 75% to 100%—but Stonegate did not obtain signed consent from 100% of the Participating Banks to accomplish that change." Id. at 26–27.

There is no indication that each bank could have different and conflicting provisions in its agreement. We discern no way to meaningfully differentiate between the parties' interpretations based on this rule. We therefore move on to the next rule.

3.

The third rule is contra proferentem, which holds that doubtful constructions should be construed against the instrument's drafter. Stonegate advocates forcefully for its application here, complaining that the district court neglected to do so. Id. at 50–52; see also Stonegate's Reply Br. 9 ("The district court's failure to consider Georgia's rule of contra proferentem was especially devastating."). Stonegate argues that TD Bank's predecessor-in-interest drafted the form agreement that all participating banks signed, and thus ambiguous language should be construed against TD Bank. Stonegate points to no specific provisions where this rule should have been applied. It does note, however, that "[i]f the other parts of the Participation Agreement had unequivocally supported the district court's construction, the district court was not compelled to apply th[is] canon. But that was not the case here." Stonegate's Reply Br. 9–10.

As noted above, each party's interpretation of Sections 16(b) and 18 is reasonable. Because the parties' intended construction is therefore ambiguous, the rule of contra proferentem suggests that we should construe these provisions in

21

favor of Stonegate.  However, the logic of this rule is less persuasive where, as here, the parties are both sophisticated entities engaged in their own lines of business.  The rule of contra proferentem thus applies with less force and is "overcome by the strength" of other rules.

4.

Finally, we arrive at the rule, from Georgia's case law, which performed the heaviest lifting in the district court's opinion: "when a provision specifically addresses the issue in question, it prevails over any conflicting general language." Order, Aug. 5, 2013, at 9 (quoting Greenwald, 723 S.E.2d at 317); see also RLI Ins. Co. v. Highlands on Ponce, LLC, 635 S.E.2d 168, 172 (Ga. Ct. App. 2006); Woody's Steaks, LLC v. Pastoria, 584 S.E.2d 41, 44 (Ga. Ct. App. 2003); Deep Six, Inc., 538 S.E.2d at 889.

Stonegate challenges the district court's definition of the "issue in question" as "a particular course of conduct with respect to the ownership and value of the Loan." Stonegate's Br. 46–47 (quoting Order, Aug. 5, 2013, at 9).  Stonegate argues that the ownership and value of the loan were not in question because "[i]t was undisputed that TD Bank owned a certain portion of the Loan and that Stonegate owned its Participation Interest in the Loan.  Nor was there any dispute regarding the value of the Loan or the Participation Interest." Id. at 47.  Stonegate offers no competing "issue in question."  For its part, TD Bank affirms that Section

22

16(b) overrides Section 18 on the issue of whether to sell the loan, because "Section 18 is a general clause that does not address any of the voting requirements of Sections 16(b) and 16(e). And Section 18 necessarily would yield to Sections 16(b) and (e) even if there were a conflict." TD Bank's Br. 26.

The district court was correct in ruling that Section 16(b) more specifically recognizes and engages with the nature of the larger, multiparty participation arrangement. Even if we more precisely define the issue in question as whether a 75% supermajority of participating interests can vote to sell the loan over the objections of a holdout minority, the "specific over general" rule still favors TD Bank. Section 16(b)—and 16(e)—with its voting requirements, seems to have been written in recognition of the reality that the Participation Agreement is one of many such agreements, all dealing with a single loan to the borrower. Section 18 omits all reference to the larger context and focuses instead on the participating bank and the lead bank. This rule, then, supports TD Bank's interpretation.[8, 9]

. . . .

---

[8] The fact that the Agreement contemplates voting requirements at all indicates that the participation interests are not as akin to absolute property rights as Stonegate would have us believe.

[9] Section 16(e) may appear to be more specific to this matter, and therefore a more appropriate provision to examine under this rule. We note that, if anything, Section 16(e) might have authorized the loan sale with only 50% of the participating interests voting in favor of it. Because the 75% voting threshold under Section 16(b) was surpassed, this point is moot, and we need not consider Section 16(e) further in order to resolve this case.

23

In sum, of the four Georgia rules of contract interpretation discussed above, the first slightly favors TD Bank, the second could favor either Stonegate or TD Bank, the third only weakly favors Stonegate, and the fourth strongly favors TD Bank.  Accordingly, we apply the first and fourth rules to resolve the ambiguity in TD Bank's favor.  See DJ Mortg., LLC., 750 S.E.2d at 805 ("[N]o canon of interpretation is absolute.  Each may be overcome by the strength of differing principles that point in other directions." (alteration in original) (quoting Estate of Pitts, 746 S.E.2d at 702 (quoting Scalia & Garner, supra, at 59))).

## IV.

For the foregoing reasons, the district court's grant of summary judgment is **AFFIRMED.**

24